*HHW*

IN THE
UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

*FILED*

MAR 2 0 2008
3-2-0-2008
MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

| | | |
|---|---|---|
| RAYMOND EAVES, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| v. | ) | No. 08 C 0024 |
| | ) | |
| DONALD HULICK, Warden, | ) | The Honorable |
| | ) | Matthew F. Kennelly, |
| Respondent. | ) | Judge Presiding. |

## TO THE CLERK OF THE UNITED STATES DISTRICT COURT

Pursuant to Rule 5 of the Rules Governing Section 2254 Cases in the United

States District Courts, respondent files the attached Exhibits to respondent's

Answer:

**Exhibit A:** Opening Brief and Argument for Defendant-Appellant, *People v. Eaves*, No. 1-97-3959;

**Exhibit B:** Brief and Argument for Plaintiff-Appellee, *People v. Eaves*, No. 1-97-3959;

**Exhibit C:** *People v. Eaves*, No. 1-97-3959 (Ill.App. Jan. 12, 1999);

**Exhibit D:** PLA, *People v. Eaves*, No. 87046;

**Exhibit E:** *People v. Eaves*, 712 N.E.2d 820 (Ill. 1999) (denying leave to appeal);

**Exhibit F:** Brief and Argument for Petitioner-Appellant, *People v. Eaves*, No. 1-05-3406;

**Exhibit G:** Brief and Argument for Respondent-Appellee, *People v. Eaves*, No. 1-05-3406;

**Exhibit H:** *People v. Eaves*, No. 1-05-3406 (Ill.App. Mar. 2, 2007);

**Exhibit I:** PLA, *People v. Eaves*, No. 104515; and

**Exhibit J:** *People v. Eaves*, 875 N.E.2d 1116 (Ill. 2007) (denying leave to appeal).

March 20, 2008

LISA MADIGAN
Attorney General of Illinois

By:

RETHA STOTTS, Bar #6270680
Assistant Attorney General
100 West Randolph Street, 12th Floor
Chicago, Illinois 60601-3218
TELEPHONE: (312) 814-0010
FAX: (312) 814-5166
E-MAIL: rstotts@atg.state.il.us

Westlaw.

1998 WL 34289821 (Ill.App. 1 Dist.)
**(Cite as: 1998 WL 34289821)**

For Opinion See 746 N.E.2d 336

Appellate Court of Illinois, First District.
PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee,
v.
Raymond EAVES, Defendant-Appellant.
No. 1-97-3959.
June 12, 1998.

Appeal from the Circuit Court of Cook County, Illinois, Criminal Division. The
Honorable Paul J. Nealis, Judge Presiding.
Oral Argument Requested

Opening Brief and Argument for Defendant-Appellant
Rita A. Fry, Public Defender of Cook County, 200 W. Adams, 4th Floor, Chicago,
Illinois, 60606, (312) 609-2040, Counsel for Appellant.Greg Koster, Assistant Pub-
lic Defender, Of Counsel.

## *2 *NATURE OF THE CASE*

Raymond Eaves was charged by Indictment 93 CR 19046 with murder, aggravated crim-
inal sexual assault, robbery, and other charges. (C.L. 8) On September 29, 1997,
Mr. Eaves' jury trial commenced and the jury found him guilty of murder, aggrav-
ated criminal sexual assault, and robbery. (F164) The trial court sentenced him to
a natural life term on October 16, 1997, in addition to other concurrent and con-
secutive sentences. (G56)

Notice of appeal was timely filed on October 20, 1997. (C208)

There are no issues raised regarding the sufficiency of the pleadings.

### JURISDICTIONAL STATEMENT

This case is an appeal from a final judgment of the Circuit Court of Cook County
pursuant to Supreme Court Rule 602 and Article VI, Section 6 of the Illinois Con-
stitution (1970).

## *ISSUE PRESENTED FOR REVIEW*

Whether the trial court erred in denying Mr. Eaves' proffered voluntary man-
slaughter instruction.

### *3 *STATEMENT OF FACTS*

### Introduction

On July 11, 1993, Denise Shelby's partially clad body was found in the abandoned

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Exhibit A

1998 WL 34289821 (Ill.App. 1 Dist.)
(Cite as: 1998 WL 34289821)

Dixie Square Mall. (E30) On September 29, 1997, Raymond Eaves went before a jury charged with murder, aggravated criminal=sexual assault, robbery, and other charges.

The prosecution presented the testimony of victim's mother Mildren Jefferson (life and death), Harvey police officer Andrew Bell, Detective William Applewhite, crime technician Paul Smith, crime lab analyst Angela Reich, forensic pathologist Edmund Donoghue, and Assistant State's Attorney Christopher Cummings. The prosecution rested and the defense rested.

### Police Find the Body and Investigate the Scene

On July 11, 1993, Harvey police officer Andrew Bell received a call that a body had been found in the abandoned Dixie Square Mall. (E29) The officer located the body at the mall and he and Detective Applewhite described it as follows: it was unclothed from the waist down, except that her panties were around one leg, (E30, E41) her shirt was pushed up, (E41) a pair of walking shorts were balled up and shoved into her mouth, (ES7) there were bruises on her neck, shoulder, face and chest, (E57), her butt was up against a wall, and one leg was up against the wall, bent at the knee, (E57) there was excrement on the floor near the decedent's anus. (E57)

*4 Illinois State. Police crime technician Paul Smith testified there was "no evidence" of a struggle at the scene where the body was found, but also testified he could not rule out "any struggle whatsoever" at the spot. (E88-E89) Technician Smith opined that the excrement on the floor near the body indicated that she had died at that spot. (EGO)

Detective Willie Applewhite testified that some 300 feet north of the mall he found a purse, comb, mascara tube, a blue pen a pink hairbrush, and a bottle of Ultra Sheen. (E61-E62) At a distance of 175 feet north of the mall he found a pair of sandals, a silver pipe, and three white buttons with threads attached. (E59, E62)

### The Medical Examiner

Forensic pathologist Edmund Donoghue testified he observed seventeen injuries and abrasions on the decedent's face, neck, back, and leg. (E104) Abrasions at the base of the neck were consistent with fingernails and with strangulation. (E110, E111) Internal neck injuries were also consistent with strangulation. (E115) Dr Donoghue testified the decedent had used cocaine shortly before her death, and had died by strangulation and gagging; an event which would take at least four minutes to accomplish. (E115, E132) The uncomfortable posture of the body indicated that she was probably dead when the defendant left her. (E134)

### *5 The Police Arrest Mr. Eaves

Detective Applewhite spoke with Raymond's brother, a Harvey police inspector, and then went to 15708 Park Ave., looking for Raymond. (E41-E42) According to Detect-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

1998 WL 34289821 (Ill.App. 1 Dist.)
(Cite as: 1998 WL 34289821)

ive Applewhite: Raymond Eaves a) said he'd recently given a ladies watch to his niece, Mecca, and b) agreed to bring himself and the watch into the police-station. (E43-E45) Again, according to Detective Applewhite, victim Denise Shelby's father identified the watch as having belonged to Denise. (E46)

### Mr. Eaves' Statement

Assistant State's Attorney Christopher Cummings testified Mr. Eaves provided him the following court-reported statement: (E152)

Mr. Eaves saw Denise Shelby "walking back and forth". She agreed to provide sexual favors in return for cocaine. (E156) Mr. Eaves purchased two bags and the two of them went to the abandoned Dixie Square Mall. (E157) When she resisted going to the mall he grabbed her and hit her, she hit him back, and he told her she would have to go through with the bargain or lose the cocaine. (E158)

He let her go and they entered the building. She removed her shorts and they smoked a bag of cocaine. (E158-E160) Mr. Eaves leaned on her to go back, she resisted going back, and Mr. Eaves hit her and had sex with her. (E162) Denise Shelby kept telling him to hurry up and he shoved her shorts in her mouth and put an arm on her neck. (E163) Mr. Eaves finished, *6 and Denise Shelby mumbled and pointed a finger at him as if to threaten him. (E164) Mr. Eaves walked out of the mall, found her purse in the parking lot, and removed some change and a watch. (E165) He tried and failed-to sell the watch to drug dealers and later gave it to his niece. (E167)

### DNA Analysis

Illinois State Police crime lab technician testified the DNA found in decedent's vagina matched that of Mr. Eaves and one in 1-3 million blacks. (F41-F43)

### Jury Instructions

The trial court denied defendant's proffered involuntary manslaughter instruction. (F69)

### Finding and Sentencing

The jury found Mr. Eaves as charged. (F164) The trial court imposed a natural life term on the murder, consecutive to a thirty-year term on the aggravated criminal sexual assault, and concurrent to a five-year term on the robbery. (G56)

### *7 ARGUMENT

I.

### THE TRIAL COURT ERRONEOUSLY REFUSED MR. EAVES' INVOLUNTARY MANSLAUGHTER INSTRUCTION.

In Mr. Eaves' court-reported statement, published by Assistant State's Attorney-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

1998 WL 34289821 (Ill.App. 1 Dist.)
(Cite as: 1998 WL 34289821)

Christopher Cummings, defendant reported that he purchased sex from Denise Shelby, that she began talking loudly and telling him to hurry up, and that he then shoved her shorts into her mouth and put his arm across her neck. (E163) According to Mr. Eaves' statement, as he left the area Denise Shelby was mumbling and pointing at him in a threatening manner. (E164) The aforementioned evidence provided a sufficient basis for an involuntary manslaughter instruction and the trial court's refusal to so instruct the jury denied Mr. Eaves a fair trial.

The issue presents a matter of law for which a de novo standard of review applies. People v. Foskey (1990), 136 Ill.2d 66, 554 N.E.2d 192.

The defendant is entitled to instructions on his theory of the case. People v. Lefler (1967), 38 Ill.2d 216, 230 M.E.2d 827.

An involuntary manslaughter instruction is appropriate where evidence in the record, if believed by the jury, would reduce the degree of the offense charged. Basically, there must be evidence in the record which would cause a jury to believe that the defendant acted recklessly instead of knowingly in *8 causing the death [of the victim. 1 people v. Johnson (3d Dist. 1990), 197 Ill. App. 3d 74, 554 N.E.2d 696.

Recklessness is defined as follows by the Criminal Code:

A person is reckless or acts recklessly, when he consciously disregards a substantial and unjustifiable risk that circumstances exist·or that a result will follow, described by the statute defining the offense; and such disregard constitutes a gross deviation from the standard of care which a reasonable person would exercise in the situation. An act performed recklessly is performed wantonly, within the meaning of a statute using the latter term, unless the statute clearly requires another meaning. 720 ILCS 5/4-6.

In the instant case, the medical examiner testified it death by strangulation and gagging would have taken at least four minutes (E132) and that Denise Shelby's posture indicated she was likely dead when Mr. Eaves left the room. (E134)

Mr. Eaves' statement to Assistant State's Attorney Christopher Cummings, on the other hand, suggests that in the midst of an on-again-off-again sex for drugs transaction and after they both had ingested cocaine, Denise Shelby kept "talking loudly"; Mr. Eaves consequently filled her mouth with her shorts and leaned on-her throat, presumably to keep her quiet; and Denise Shelby was alive and gesturing angrily at him when he left the scene. (E163-E164)

In the instant case-.the medical, examiner's suggestion of a deliberate four-minute strangulation may sound more credible than Mr. Eaves' description of a relatively brief obstruction *9 of decedent's airways for the purposes of "shutting her up." Issues of credibility are, however, for the jury, and it therefore appears that this court must either take on that function itself or remand the case for a new trial in which Mr. Eaves' theory of the defense may be presented.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

1998 WL 34289821 (Ill.App. 1 Dist.)
(Cite as: 1998 WL 34289821)

Page 5

CONCLUSION

For the foregoing reasons, Mr. Eave's case must be remanded for a new trial.

Appendix not available.

PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. Raymond EAVES, Defendant-Appellant.
1998 WL 34289821 (Ill.App. 1 Dist.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw

1998 WL 34289820 (Ill.App. 1 Dist.)
(Cite as: 1998 WL 34289820)

Page 1

For Opinion See 746 N.E.2d 336

Appellate Court of Illinois, First District.
PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee,
v.
Raymond EAVES, Defendant-Appellant.
No. 1-97-3959.
October 20, 1998.

Appeal from the Circuit Court of Cook County, Criminal Division. Honorable Paul J. Nealis, Judge Presiding.

Brief and Argument for Plaintiff-Appellee
Richard A. Devine, State's Attorney, County of Cook, Room 309 - Richard J. Daley Center, Chicago, Illinois 60602, Attorney for Plaintiff-AppelleeRenee Goldfarb, Jon J. Walters, Michael Ewert, Assistant State's Attorneys, Of Counsel.

## *1 POINT AND AUTHORITIES

THE TRIAL JUDGE PROPERLY REFUSED TO GIVE AN INVOLUNTARY MANSLAUGHTER INSTRUCTION. ASSUMING, *ARGUENDO*, THAT ERROR OCCURRED, SUCH ERROR WAS HARMLESS, WHERE EVIDENCE OF DEFENDANT'S GUILT WAS OVERWHELMING, AND WHERE AN INVOLUNTARY MANSLAUGHTER IN-STRUCTION WAS NOT AVAILABLE ON THE FELONY-MURDER CHARGES ... 22

*People v. Castillo*, 298 Ill. App. 3d 839, 698 N.E.2d 604 (1st Dist. 1998) ... 22, 23

*People v. DiVincenzo* ___ Ill.2d ___, 1998 Ill. Lexis 912 (1998) ... 23

*People v. Reeves*, 228 Ill.App.3d 788, 593 N.E.2d 683 (1st Dist. 1992) ... 25

*People v. Tainter*, 294 Ill.App.3d 634, 691N.E.2d 55 (1st Dist. 1998) ... 26, 27, 28

*People v. Trotter*, 178 Ill.App.3d 292, 533 N.E.2d 89 (1st Dist. 1988) ... 28

*People v. Tucker*, 186 Ill.App.3d 683. 542 N.E.2d 804 (1st Dist. 1989) ... 30

*People v. Baney*, 229 Ill.App.3d 770, 595 N.E.2d 188 (1st Dist. 1989) ... 30

*2 *People v. Sandy*, 188 Ill.App.3d 833. 544 N.E.2d 1248 (4th Dist. 1989) ... 31

720 ILCS 5/9-1(a)(2) ... 23

720 ILCS 5/9-3(a) ... 23

## ISSUE PRESENTED FOR REVIEW

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Exhibit B

1998 WL 34289820 (Ill.App. 1 Dist.)
(Cite as: 1998 WL 34289820)

Whether the trial judge properly refused to give an involuntary manslaughter instruction. Whether. if error occurred, such error was harmless.

## STATEMENT OF FACTS

Defendant. Raymond Eaves. was indicted by the Grand Jury, Indictment Number 93 CR 19046, on sixteen counts of first-degree murder, seven counts of aggravated criminal sexual assault, one count of criminal sexual assault, five counts of aggravated kidnapping, one count of robbery, two counts of kidnapping, and one count of unlawful restraint. (C.R. 8-40) Following a jury trial before the Honorable Paul J. Nealis. defendant was convicted of three counts of first-degree murder, aggravated criminal sexual assault, and robbery. (C.R. 194-198; R. F164) Judge Nealis sentenced defendant to a natural life term of imprisonment in the Illinois Department of Corrections on the first-degree murder conviction, to a consecutive thirty-year term of imprisonment on the aggravated criminal sexual assault conviction, and to a concurrent five-year term of imprisonment on the robbery conviction. (R. 56G) Defendant now appeals his first-degree murder conviction.

Harvey Police Officer Andrew Bell testified that on July 11, 1993, at approximately 6:00 PM, he received a dispatch to go to the abandoned Dixie Square Shopping Mall in regards to a possible deceased person. (R. E29)- Upon arriving at Dixie Square Mall. Officer Bell proceeded to 151st Street and Hoyne. to what previously was a J.C. Penny store, where he met two minors. (R. E30) While talking with the two minors, Officer Bell noted a person he had *4 seen in the neighborhood on different occasions in the stairwell area. (R. E34)

Officer Bell entered the rear door of the old J.C. Penny store, and observed-what appeared to be the deceased body of a young black female, later identified as Denise Shelby. (R. E30) Denise was on her back. with her head pointing in a southward direction, and her buttocks against the north wall of the building. (R. E30) Denise was clothed in a flowered outfit, shirt, and blue leather jacket. (R. E30) She was not clothed from the waist down. (R. E30) What appeared to be short pants from her outfit were in Denise's mouth. (R. E37) The area around Denise's body was filthy and dusty. (R. E37) Officer Bell did not move Denise's body. immediately called for his supervisor and a paramedic unit, and secured the area by blocking the door of the J.C. Penny Store with his squad car. and by cordoning off the area with black and yellow evidence tape. (R. E30; E32) Officer Bell and the two minors were the only people on the scene until Sergeant Brown, Detective Applewhite, and Inspector Overton arrived. (R. E32) Inspector Eaves from the Harvey Police Department arrived. (R. E32-33) While at the scene, Officer Bell observed defendant talking with his brother, Inspector Eaves, (R. E33)

Harvey Police Officer Willie Applewhite testified that on July 11, 1993, between 6:00 PM and 6:30 PM, he received a page in regards to a body discovered at the Dixie Square Mall. (R. E39-40) Officer Applewhite proceeded to the Dixie Square Mall, and upon arriving, went to the north end of the building, where he met Inspectors Overton and Eaves, Sergeant Brown, and Officer Bell. (R. E40) The area was cordoned off with yellow tape. (R. E40) To the north of the mall, Officer Ap-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

1998 WL 34289820 (Ill.App. 1 Dist.)
(Cite as: 1998 WL 34289820)

plewhite observed a pair of white sandal shoes, some buttons, a brown suede purse, and some cosmetic items. (R. E40) *5 The area outside the mall was dirty, with bits of glass, bits of dirt and debris, and junk in the area. (R. E49) Officer Applewhite did not see any footprints or any drops of blood from a cut foot in that area, and he also did not observe any blood drippings going into or out of the doorway area. (R. E49) No blood drippings were found leading either from or toward Denise's body. (R. E49)

Officer Applewhite entered the old J.C. Penny store, and observed Denise's body just inside the stairwell door, lying on her back, with her buttocks and legs up against the wall. (R. E41) Denise's head faced in a southerly direction, her shorts had been pulled off and stuffed into her mouth, and her shirt was pushed up. (R. E41) Denise's body was naked from the waist down, except for a pair of panties on her left leg. (R. E41)

Officer Applewhite had a conversation with Inspector Eaves of the Harvey Police Department. (R. E41) Defendant was not at the scene while Officer Applewhite was present. (R. E41) As a result of his conversation with Inspector Eaves, a few days later, on July 15, 1993, Officer Applewhite went with Inspector Bonner to 15037 Cooper, the address of Eaves' parents, in search of defendant. (R. E41-42) The house at this address is across the street and just north of the mall, and the mall is visible to a person standing in front of the house. (R. E46-47) Upon arriving, Officer Applewhite did not speak with defendant, but did have a conversation with Inspector Eaves and, as a result of this conversation, Inspector Bonner and Officer Applewhite proceeded to 15708 Park Avenue looking for defendant. (R. E42-43)

Inspector Bonner and Officer Applewhite arrived at 15708 Park Avenue, and asked defendant if they could talk to him about information he had provided to his brother concerning Denise. (R. E43) Defendant invited the officers *6 into the house, and they proceeded inside. (R. E43) Once inside the house, Officer Applewhite asked defendant if he would come down to the station and talk with them, and defendant agreed to do so. (R. E43) While still at the house, Officer Applewhite also asked defendant if he had given a watch to one of his nieces, defendant replied that he had, and defendant then called the niece to come downstairs. (R. E43-44) Defendant's niece came downstairs, and Officer Applewhite asked her if her uncle had given her a watch some time earlier, to which defendant's niece replied "yes." (R. E44) Officer Applewhite asked defendant's niece if he could look at the watch, and she went upstairs, retrieved the watch, and brought it downstairs, giving it to Officer Applewhite. (R. E44) Both defendant and defendant's niece agreed to allow Officer Applewhite to bring the watch to the police station along with defendant. (R. E44-45)

Officer Applewhite proceeded to the police station with defendant and the watch and, upon arrival, placed defendant in the tactical office. (R. E45) Officer Applewhite then called Dan Shelby, the Denise's father, asking him to come down to the police station and identify some property. (R. E45) Mr. Shelby agreed, arrived

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

1998 WL 34289820 (Ill.App. 1 Dist.)
(Cite as: 1998 WL 34289820)

about ten or fifteen minutes later, and identified the watch that Officer Apple-
white showed him as his daughter's watch. (R. E45-46)

Officer Applewhite described defendant as being about 6'1 tall, and weighing 160
pounds at that time. (R. E46)

Illinois State Police Sergeant Paul Smith testified that in July of 1993, he was
with the Illinois State Police Bureau of Crime Scene Serviees as a crime scene
technician. (R. E53-54) On July 11, 1993. at approximately 6:40 PM, Sergeant Smith
received a request from the Harvey Police Department to process a death scene in-
vestigation at the abandoned Dixie Square Mall. (R. *7 E55) At approximately 7:10
PM. Sergeant Smith arrived at the mall. entered the J.C. Penny store, and observed
Denise's body. (R. E55-56) Denise's pelvic area was positioned very close to the
north wall. and her right leg was on the floor against the wall. (R. E56) Denise's
left leg was raised upward from the torso along the north wall, bent at the knee.
(R. E56-57) The area surrounding Denise was dirty with dust and debris. (R. E84)
The area west of Denise's body had what appeared to be a traffic pattern, for
there were numerous footwear impressions and shoeprints in the dust and debris on
the floor. (R. E84-85) The location where the body was found did not have any
footwear impressions, naked footprints, or shoeprints, and did not appear to have
been disturbed. (R. E85) Sergeant Smith also did not observe any heel drag marks,
any buttock drag marks, or any leg drag marks in the area where Denise's body was
found, or in the area directly inside of the door. (R. E85)

Sergeant Smith observed a pair of red and black panties on Denise's left knee. and
a blue leather jacket over a flowered halter-top shirt. (R. E57) He observed that
Denise's shirt was lifted up and her left breast was exposed, and that she was na-
ked from the waist down. (R. E57) Shorts which matched Denise's halter-top had na-
been balled up and pushed inside of her mouth. (R. E57)

Sergeant Smith noted that Denise's blue jacket and pants were extremely dirty,
much like the condition of the floor in that location. (R. E86) No comparison was
performed by the forensic science lab between the dirt in the room and the dirt on
Denise's jacket. (R. E86) The large amount of dirt on the bottom of the jacket,
and the amount of dirt on the floor in the landing area, indicated to Sergeant
Smith that Denise was on the floor at one time, and that her body was placed
against the wall afterward. (R. E87)

*8 Sergeant Smith observed that Denise's buttocks and pelvic area were very close
to the wall, and that there was excrement on the wall by Denise's anus. (R. E57)
Denise had several bruises on her chest and shoulder, neck area, and face. (R.
E57) Sergeant Smith observed no signs of struggle in the area where the body was
found, but the presence of debris in the area where Denise's body was found did
not rule out any struggle whatsoever. (R. E88-89) The bruises all over Denise's
body and her shorts shoved in her mouth indicated to Sergeant Smith that Denise
was attacked, that her shorts were put into her mouth, and that she may have
struggled at that time. (R. E88)

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

1998 WL 34289820 (Ill.App. 1 Dist.)
(Cite as: 1998 WL 34289820)

Outside of the mall, Sergeant Smith proceeded through the parking lot in a north-erly direction from the J,C, Penny building, and observed a white handkerchief and other items. (R. E59) All buttons found in the parking lot were similar to each other, and all had threads attached to them. (R. E60) Two sandals found in the parking lot matched each other, and padding to one of the shoes was found on the ground next to the shoe. (R. E60) Sergeant Smith did not notice any embedded debris in the soles of Denise's shoes. (R. E91) Weeds, debris, dirt, garbage, and broken glass particles all occupied the parking lot area. (R. E81)

In a section of the parking lot northeast of where Sergeant Smith found the above evidence, he observed six items leading across the parking lot in a line toward the northeast. (R. E61: E82) Included among these items were a brown leather purse, a purple comb. a blue and gold tube, a mascara tube. a blue pen, a pink hair brush, and a bottle of Ultra Sheen cosmetics. (R. E61) The purse was found approximately three hundred feet from the doorway of the building where Denise's body was found, and the two sandals were found approximately one hundred seventy-five feet away from the door leading to the *9 landing where Denise's body was found, (R. E62: E81) In that one-hundred seventy-five foot area Sergeant Smith did not find any blood drippings or footprint markings, (R. E81: E82) Sergeant Smith sealed all these items and submitted them to the Joliet Forensic Science Laborat-ory for evaluation, (R. E64)

Sergeant Smith believed Denise died in the room where her body was found, (R. E90) Except for the blood coming from Denise's mouth, the bruises to her chest, neck, and head could have occurred in the parking lot area, and it was also possible that Denise's bruises could have come from some other time or day. (R. E91)

Dr. Edmund Donoghue, the Chief Medical Examiner of Cook County. has conducted over 6,000 autopsies, and has testified as an expert in the field of forensic pathology over 700 times, (R. E95: E102)

Dr. Donoghue supervised Dr. Cynthia Porterfield, an Assistant Medical Examiner. as she conducted an autopsy in Dr. Donoghue's presence, on Denise Shelby, (R. E103) Denise Shelby's body, as Dr. Donoghue observed it on July. 12, 1995, was that of a young black female, ninety-seven pounds, five foot two-and-a-half inches in length, (R. E104)

Dr. Donoghue observed seventeen external injuries, (R. E104-105) The first extern-al injury observed was Denise's bruised and swollen right upper eyelid which, in Dr. Donoghue's opinion, is an injury consistent with a punch to the eye. (R. E105) Second, the sclera, or white part, of the right eye. contained large hemorrhages, or bleeding, into the white part of the eye on the right side. (R. E105) This hem-orrhaging to the eye indicated to Dr. Donoghue that Denise had been strangled, (R. E105) Third. in the sclera of the left eye, there were pinpoint hemorrhages known as petechial hemorrhages, which Dr. *10 Donoghue testified are commonly seen in cases of strangulation. (R. E106) Fourth, the inside linings of the left upper and lower eyelids contained multiple pinpoint, or petechial, hemorrhages. (R. E107) Dr. Donoghue testified that this was consistent with an individual being

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

1998 WL 34289820 (Ill.App. 1 Dist.)
(Cite as: 1998 WL 34289820)

strangled. (R. E107) Fifth, the inner lining of the right upper and lower eyelids
also contained multiple pinpoint, or petechial, hemorrhages. (R. E107) Sixth, on
the left side of Denise's face, directly below the left earlobe, there was an ab-
rasion or scrape of the skin, which measured two-tenths by two-tenths of an inch.
(R. E107) Seventh, on the left side of Denise's face, at the corner of the mouth,
there was an abrasion or scrape which measured two-tenths by four-tenths of an
inch. (R. E108) Eighth, on the lower aspect of the chin there were two abrasions,
or scrapes, with the first scrape measuring three-tenths by eight-tenths of an
inch, and the second measuring four-tenths by two-tenths of an inch. (R. E108)

Ninth, in the midline, or middle, of the neck, there was an abrasion which meas-
ured two and two-tenths of an inch. (R. E108) Tenth, on the left inferior surface
of the chin, there was a scrape or abrasion which measured three-tenths of an
inch. (R. E108) Eleventh, at the left base of the neck, and the left upper chest,
there were three abrasions, which measured four-tenths of an inch, three-tenths of
an inch, and one and one-tenth of an inch. (R. E108-109) Twelfth, there was an ab-
rasion on the base of the neck in the midline, which measured two-tenths by one
and eight-tenths of an inch. (R. E109) Thirteenth, on the front left shoulder,
there was an abrasion which measured one and eight-tenths of an inch by nine-
tenths of an inch, (R. E109) Fourteenth, on the back of the left shoulder, there
was an abrasion which measured four-tenths of an inch. (R. E110) Fifteenth, on the
left upper back. *11 near the midline there was an abrasion, which measured one
and eight-tenths of an inch in length. (R. E110) Sixteenth, on the back right up-
per leg. just below the knee. there was an abrasion which measured three-tenths of
an inch, (R. E110) Seventeenth, after Dr, Porterfield removed the gag from Den-
ise's mouth, the tongue was pushed posteriorly, which resulted from the gag taking
up the space in the front of the mouth. (R. E110)

Dr. Donoghue testified that some of these injuries around the neck and cheek area
of Denise. especially the abrasions, were consistent with an individual being
strangled to death. (R. E110-111) When force is applied to the neck either with
the arm or hands, it is not unusual that the skin is scraped and abrasions are
left on the surface of the skin, and some of the injuries around Denise's neck and
cheek were consistent with fingernail injuries, (R. E111)

Denise's body had six internal injuries. First, on the left side of the neck in
the sternothyroid muscle, which is a muscle running from the sternum up to the
thyroid cartilage, commonly known as the Adams Apple. there was a hemorrhage, or
bleeding, which indicated to Dr. Donoghue that the muscle was compressed and in-
jured. (R. E112) Second, on the right side of the neck in the thyrohyoid muscle,
which is a muscle that runs from the thyroid cartilage, or Adams Apple, up to the
U-shaped bone at the base of the tongue, known as the hyoid bone, there was a hem-
orrhage, which indicated that the muscle was compressed and injured. (R. E112)
Third. beneath the left lobe of the thyroid gland, there was a hemorrhage, indic-
ating that the thyroid gland was compressed, (R. E113) Fourth. in the inferior
constrictor muscle of the pharynx, a muscle in the area between the back of the
mouth and the upper portion of the esophagus, as a result of the compressed neck,

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

1998 WL 34289820 (Ill.App. 1 Dist.)
(Cite as: 1998 WL 34289820)

the larynx *12 pressed against the inferior constrictor muscle and trapped it between the cervical spine, which caused injury and bleeding. (R. E113) Fifth, there was bleeding in the area of the thyrohyoid ligament, which again indicates compression of the neck, and is consistent with strangulation. (R. E113-114) Sixth, the margin of the tongue had bite marks with a hemorrhage on the right side of the tongue, on the tip of the tongue, and on the left side of the tongue. (R. E114) Dr. Donoghue testified this occurs when the neck is compressed, and the jaw is forced in an upward direction, catching the tongue between the upper and lower teeth, leading to bleeding. (R. E114) These injuries to the tongue are consistent with strangulation, and they are commonly seen in strangulation. (R. E114)

The blood on Denise's face appeared to come from her nasal passage area, but the actual source of the bleeding could not be determined, (R. E139) When Denise was in the position of lying down. the blood could have come out of her nose and down her face. (R. E139-140)

During the external examination of Denise, Dr. Donoghue noted no debris or other items on the soles of Denise's feet, and there were no photos showing cuts, abrasions, bruises, or other injury to the bottoms of Denise's feet, (R. E136)

Blood was removed from Denise. and Nancy Chan, a toxicologist. performed a toxicology test, which revealed that Denise had cocaine in her system at a level of .13 micrograms per milliliter, (R. E114-115) This test indicated that Denise had used cocaine shortly before her death. (R. E115) A metabolite of cocaine, benzoylecgonine, was found in Denise's blood in the amount of 2,24 micrograms per millimeter, an amount greater than the amount of *13 actual cocaine in her system, showing Denise's body had processed quite a bit of the cocaine. (R. E137)

Dr. Donoghue. after examining slides and photos of Denise's corpse. testified that the abrasions and scratches on her face. chin. neck, chest, and shoulder, the blood streaming from the right side of her face. and her pushed-back tongue, were all consistent with fingernail marks and strangulation. (R. E118-130) The abrasions on Denise's body occurred near the time of her death. (R. E140) It is not unusual for the victim of a strangulation to defecate upon being killed. (R. E130-131) The evacuation of Denise's bowels probably occurred at the location at which she finally died. (R. E140) Dr. Donoghue stated that. based upon his experience and education, it takes about a minimum of four minutes to strangle a person to death, and requires a relatively great amount of force from the strangler. (R. E132) Based on Denise's autopsy and the crime scene photos. Dr. Donoghue did not think Denise could have sat up after the attack and made a motion to her attacker, because she would have been dead. (R. E133) Based upon the autopsy, the crime scene photos, and the position of Denise's body, Dr. Donoghue testified that Denise was left in that position by her attacker, posed up against the wall. (R. E133-134) The gag in Denise's mouth indicated to Dr. Donoghue that it was unlikely that Denise would want to put her body up against the wall in the position in which she was found. (R. E134) Based upon Dr. Donoghue's observations of the crime scene photos and the autopsy. Dr. Donoghue believed Denise was dead when her at-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

1998 WL 34289820 (Ill.App. 1 Dist.)
(Cite as: 1998 WL 34289820)

tacker left her. (R. E134)

Assistant State's Attorney Christopher Cummings traveled to the Harvey Police Sta-
tion, arriving at approximately 2:30 PM on July 16. 1993. (R. E145) Upon arrival,
ASA Cummings first spoke with the officers assigned to the case. *14 Inspector
Overton and Detective Lewellyn, who related to ASA Cummings what they knew of the
case while ASA Cummings reviewed the police reports. (R. E145) ASA Cummings-
traveled with the police to observe where the incident took place. (R. E146)

At approximately 4:00 PM, with Inspector Overton present, ASA Cummings spoke to
defendant in an interview room at the Harvey Police Station. (R. E146) Upon enter-
ing the room, ASA Cummings informed defendant who he was, his name. that he was an
Assistant State's Attorney. that he was an attorney working for the police, and
that he was not defendant's attorney. (R. E147) When ASA Cummings asked defendant
if he understood this, defendant replied that he understood. (R. E147) ASA Cum-
mings informed defendant of his rights, and after explaining each right to defend-
ant, ASA Cummings asked defendant if he understood those rights, and each time de-
fendant responded that he understood his rights. (R. E147-148)

ASA Cummings then had a twenty or thirty minute conversation with defendant, dur-
ing which he asked defendant if he would be willing to have a court reporter
called in to take down verbatim everything that defendant said, and defendant
agreed. (R. E148) At that point, ASA Cummings asked Inspector Overton to leave the
room, and ASA Cummings sat alone with defendant, and asked defendant if anyone had
mistreated him in any way. and defendant replied "no." (R. E148-149) ASA Cummings
also asked defendant if he had been allowed to use the bathroom, if he had had
enough to eat. or if he had any needs, to which defendant replied that he had been
taken care of, and that he did not have any complaints. (R. E149) At that point,
ASA Cummings left the room and called for a court reporter. (R. E149) Tim Bennett,
a court reporter, came out to *15 the Harvey Police Station. and ASA Cummings, the
court reporter, and Inspector Overton, went back into the room where defendant was
waiting. (R. E149)

Once the court reporter had his machine set up, ASA Cummings repeated for the re-
cord what he had said to defendant earlier, read defendant his rights again, and
again asked defendant if he understood those rights, to which defendant again
replied that he did. (R. E150) ASA Cummings then had a further conversation with
defendant concerning the death of Denise Shelby. (R. E150) At the conclusion of
the conversation, the court reporter and everybody else left the room, and the
court reporter went to type everything up. (R. E150-151)

When the court reporter completed typing defendant's statement. ASA Cummings went
back into the interview room and sat next to defendant, and they proceeded to go
through the statement together. (R. E151) ASA Cummings read defendant's statement
out loud as defendant read along, and defendant corrected two or three street name
misspellings. (R. E151) Whenever a correction was made, both ASA Cummings and de-
fendant initialed each correction. (R. E152) At the conclusion, ASA Cummings asked
defendant whether the statement was correct, to which defendant replied that it

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

1998 WL 34289820 (Ill.App. 1 Dist.)
(Cite as: 1998 WL 34289820)

was. (R. E152) ASA Cummings. defendant, and Inspector Overton then went through and initialed each page, and at the end all three signed defendant's statement. (R. E152)

Defendant's statement to police about the death of Denise Shelby on July 11.1993, contained the following details. Defendant stated that on the night in question, he was at his cousin's home from 7:30 PM until a little before midnight. (R. E155) A little before midnight, defendant saw a young lady walking back and forth while he was sitting on the steps of his cousin's apartment. (R. E155-156) About the third time the young lady walked past, *16 defendant asked her if she wanted to have sex if he would buy cocaine and, after defendant showed the young lady about thirty-five dollars, she agreed. (R. E156-157) After they crossed the street and purchased two dime bags of cocaine, defendant placed the cocaine in the young lady's hands, and told her he knew of a place where they could go and smoke the cocaine. (R. E157) Defendant and the young lady proceeded out of the alley, toward the Dixie Square Shopping Center. (R. E157)

Once at Dixie Square Mall, they stopped in the parking lot for a little while, because the young lady did not want to go into the abandoned building. (R. E158) Defendant told the young lady that she slept in there, that everything was fine, and that the place they were going to was just a little room. (R. E158) After the young lady showed some hesitation about entering the building, defendant grabbed her by the jacket, and told her that she could give him his two bags of cocaine back or she could come in. (R. E158) At that point, when defendant grabbed the young lady's jacket, she swung with her hand or purse and hit defendant in the back of his neck, and defendant responded by swinging and hitting the young lady with a left backhand. (R. E158) As defendant and the young lady started walking toward the buildings, the young lady informed defendant that he could let her go, defendant let her go, and they proceeded to the building. (R. E158) When they arrived at the building doorway, the young lady started talking really loudly again. (R. E158) Defendant opened the door and told the young lady that she could come inside and give him his cocaine back, to which the young lady replied "okay." (R. E159)

Defendant stated that they proceeded inside the building, where she removed her shorts. (R. E159) Defendant remembered the young lady wearing a *17 jacket, but he could not recall its color, or whether the jacket was pleather or leather. (R. E159) The young lady was wearing black and white shorts, which were mostly white with black dots all over. (R. E159) The young lady told him "see, now I want to give you what you want. But let's smoke a bag first," and defendant replied "fine." (R. E159) The young lady pulled an antenna out of her coat pocket to smoke the cocaine, which she had already removed from the bag and held in her hand. (R. E159)

After smoking some of the cocaine, defendant told the young lady, "well, you already got your shorts off. Let's go ahead on and start having sex. That is what I'm paying you for." (R. E160) The young lady told defendant "No. not right now.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

1998 WL 34289820 (Ill.App. 1 Dist.)
(Cite as: 1998 WL 34289820)

Let's go ahead and do the other bag." (R. E160) The young lady was sitting on the floor facing defendant, with her shorts off to her left. (R. E160-161) Defendant began leaning on the young lady to force her to lay down. and the young lady responded by putting one arm behind her, and by using the other to grab defendant on the right arm to prevent herself from going back. (R161-162) Defendant told her "you come on." (R. E162) Defendant stated that "The way she was grabbing me. I cannot stand needles. It was like she's pinching me." (R. E162) Defendant responded at that point by punching the young lady with a closed left fist somewhere in the face. (R. E162) Defendant is left-handed. (R. E162) The young lady then told defendant, "okay, come on," and they laid down and started having vaginal sex, at which point the young lady started to talk loudly. (R. E162)

The young lady kept on talking, and defendant grabbed her shorts and told her that if she kept talking loudly, as if she wanted someone to come up and see what they were doing, that he would put her shorts in her mouth. (R. E162-163) The young lady told defendant that he was not going to do anything, *18 and to "Just come on and hurry up and finish." (R. E163) The young lady continued to talk while defendant had sex with her. defendant put the shorts in his hand where the young lady couldn't see them. and defendant then put the shorts in the young lady's mouth. (R. E163) The young lady continued to talk after the shorts had gone in her mouth. (R. E163) According to defendant, the young lady "was like uh, uh, uh, uh." and he then put his right arm across her neck and pushed the shorts in her mouth with his left hand. (R. E163. E167) The young lady continued "mumbling." but defendant could not understand what she was saying, because the shorts were in her mouth. (R. E164) The young lady said nothing to defendant because her shorts were in her mouth. (R. E168)

Defendant finished having sex. got up to find his pants and belongings, and the young lady then sat up and pointed at defendant with her middle finger in a threatening manner. (R. E164: E174) Defendant told the young lady that he was going to go ahead and get his other bag and do it himself. (R. E164) The young lady said nothing else to defendant, who then left the room to look for the young lady's purse, which he did not see in the room. and which he knew she had with her. (R. E165) Defendant found the young lady's purse in the parking lot. went through it. found makeup and lipstick. and threw items from the purse while walking. (R. E165) Defendant did not find the other cocaine bag in the young lady's purse. (R. E165) Defendant did find another plastic purse within the purse, which contained a watch and some change that fell out of a hole in the plastic purse. (R. E165) Defendant then began "feeling around for the change and for the other bag and stuff," but he did not find the other bag of cocaine. (R. E165) Defendant picked up as much change as he could and put the rest of the change in his hand. and then into *19 his pocket. (R. E165-166) Defendant picked up nothing else but the change as he was feeling around on the ground, (R. E166)

Defendant stood at the corner of 151st Street and Robey for a few minutes, wondering if the watch inside the young lady's purse was working or not, (R. E166) Once defendant observed the watch and noted that it did work. he attempted to find

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

1998 WL 34289820 (Ill.App. 1 Dist.)
(Cite as: 1998 WL 34289820)

"some dope guys on Myrtle and Loomis." to whom defendant thought he could sell the watch. (R. E166) No one bought the watch from defendant. (R. E167) Defendant then proceeded to Broadway and observed a few people, but they also did not want the watch, so defendant then headed southbound on Broadway and went home, (R. E167) Upon arriving home, defendant observed his niece, Mecca, told her he had just found a lady's watch that he could do nothing with, and gave her the watch. (R. E167)

When the young woman's body was found at the scene by his neighbor's son, defendant was in his mother's yard, and defendant went over to the scene and talked with Sergeant Brown and his brother, Inspector Eaves, (R. E169) Defendant told his brother that he had been at Goochies, near the scene on 152nd Street and Dixie Highway, that he left Goochies around 11:30 PM going on midnight, and that he had heard a woman screaming in the parking lot. (R. E170) Defendant did not tell officers anything about what happened on that day, and never talked to his brother about the young woman, because they would not let anyone see her. (R. E170) Defendant did not know it was the same young lady he had been with, and stated that if they would have let him see the woman, he probably would have said something at that time, but defendant "just assumed it was a lady they found over there." (R. E170)

Angela Reich testified that she is employed as a forensic scientist specializing in DNA analysis at the Illinois State Police Crime Lab in *20 Springfield. (R. F4-5) On March 27, 1995, she received evidence from the Illinois State Police Crime Lab regarding the blood standard of defendant. Denise's blood standard, and vaginal swabs from Denise. (R. F30) Ms. Reich performed DNA analysis using the blood standard from defendant. Denise's blood standard, and the vaginal swabs from Denise. (R. F31-32) Ms. Reich noted a visual DNA match between the vaginal swab taken from Ms. Denise's body and the blood standard of defendant. (R. F34-37; F43-44) A computerized check supported Ms. Reich's visual determination of a DNA match, as the results showed a mathematical match between the vaginal swab taken from Denise and the blood standard of defendant. (R. F40) Ms. Reich's numerical analysis revealed that the semen identified in the vaginal swab taken from Denise was consistent with having originated from defendant, and using the database at the Federal Bureau of Investigation, she determined that the profile identified in the vaginal swabs matching defendant would be expected to occur in approximately one in 3.7 million African-Americans. (R. F43)

The parties stipulated that evidence technician Paul Smith, if called to testify, would state that he retrieved the vaginal swab, People's Exhibit 82, and a blood sample, People's Exhibit 80, of Denise Shelby from Dr. Cynthia Porterfield on July 12, 1993. (R. F47)

At the jury instruction conference, defendant requested that he be allowed to tender to the trial judge an issues instruction and definitional instruction, as well as a form of verdict for involuntary manslaughter, (R. F66) Following argument on defendant's requested instruction, the trial-judge denied the requested

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

1998 WL 34289820 (Ill.App. 1 Dist.)
(Cite as: 1998 WL 34289820)

Page 12

instruction, noting that no evidence in the record supported such an instruction, and that nothing in evidence before the jury would reduce defendant's crime to manslaughter or a lesser-included offense. *21 (R. F69-70) At the close of all the evidence, the jury found defendant guilty of first-degree murder, first-degree murder based on felony-murder, aggravated criminal sexual assault, and robbery. (R. F164)

### *22 ARGUMENT

THE TRIAL JUDGE PROPERLY REFUSED TO GIVE AN INVOLUNTARY MANSLAUGHTER INSTRUCTION. ASSUMING, ARGUENDO, THAT ERROR OCCURRED, SUCH ERROR WAS HARMLESS, WHERE EVIDENCE OF DEFENDANT'S GUILT WAS OVERWHELMING, AND WHERE AN INVOLUNTARY MANSLAUGHTER IN-STRUCTION WAS NOT AVAILABLE ON THE FELONY-MURDER CHARGES.

Defendant contends that the evidence in the instant case established a sufficient basis to justify an involuntary manslaughter instruction, and that the trial judge denied defendant a fair trial when he refused to give an involuntary manslaughter instruction to the jury. The trial judge properly refused to give an involuntary manslaughter instruction where a great disparity in size and strength existed between defendant and Denise, where defendant's brutality in killing Denise was extreme, where uncontested expert testimony established that strangling someone to death requires a minimum of approximately four minutes and a great deal of force, and where Denise's injuries were severe and consistent with strangulation. In ad-dition, an involuntary manslaughter instruction was not warranted, where the nature of defendant's killing of Denise demonstrates that defendant did not act recklessly. Assuming, arguendo, that error occurred, such error was harmless, where evidence of defendant's guilt was overwhelming, and where an involuntary manslaughter instruction was not available on the felony-murder charges.

The decision to give a specific jury instruction lies within the province of the circuit court and that decision will not be reversed absent an abuse of discre-tion. People v. Castillo, 298 Ill.App.3d 839, 1998 Ill.App. LEXIS 514, 8, 698 N.E.2d 604 (1st Dist. 1998). An involuntary manslaughter instruction should be given when there is some credible evidence in the record that would reduce the crime of first-degree murder to involuntary manslaughter. *23 People v. Castillo 1998 Ill.App. LEXIS 514, 9: People v. DiVincenzo, ___ Ill.2d ___, 1998 Ill. LEXIS 912, 11 (1998). In addition, an involuntary manslaughter instruction is generally not warranted where the nature of the killing, shown by either multiple wounds or the victim's defenselessness, shows that defendant did not act recklessly. People v. DiVincenzo, ___ Ill.2d ___, 1998 Ill. LEXIS 912, 14 (1998). Under section 9-1(a)(2) of the Code, a defendant commits first-degree murder when he kills an individual without lawful justification and he knows that his acts create a strong probability of death or great bodily harm. 720 ILCS 5/9-1(a)(2) In contrast, a de-fendant commits involuntary manslaughter when he performs acts that are likely to cause death or great bodily harm to another and he performs these acts recklessly. 720 ILCS 5/9-3(a) Although not dispositive, certain factors may suggest whether a defendant acted recklessly and whether an involuntary manslaughter instruction is

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

1998 WL 34289820 (Ill.App. 1 Dist.)
(Cite as: 1998 WL 34289820)

appropriate. *People v. DiVincenzo*, ___ Ill.2d ___, 1998 Ill. LEXIS 912. 13 (1998). These factors include: (1) the disparity in size and strength between the defendant and the victim: (2) the brutality and duration of the-beating. and the severity of the victim's injuries: and (3) whether a defendant used his bare fists or a weapon, such as a gun or a knife. *People v. DiVincenzo*, ___ Ill.2d ___, 1998 Ill. LEXIS 912. 13-14 (1998).

In the instant case. the trial judge properly refused to give an involuntary manslaughter instruction. First, as established at the autopsy. Denise Shelby weighed ninety-seven pounds and was 5'2 tall. (R. E104) Defendant was about 6'1 tall, and weighed approximately 160 pounds at the time of his arrest for the instant murder. (R. E46) Thus. a great disparity in size and weight existed between defendant and Denise and. when coupled with defendant's strength advantage and the medical evidence showing Denise died of *24 strangulation and gagging, the jury could infer from these disparities that the two would not be evenly matched in a struggle. This disparity in size and strength was one factor which demonstrated that defendant acted intentionally rather than recklessly in killing Denise, and supported the trial judge's refusal to give an involuntary manslaughter instruction.

The second factor which supported the trial judge's refusal to give an involuntary manslaughter instruction was the brutality of defendant's killing. In his statement, defendant related that Denise resisted when he attempted to "lean" on her to initiate sex. (R. E161) Defendant related that at the moment Denise grabbed him, which made it feel as if she was pinching him, defendant struck Denise with a closed left fist in the face. (R. E162) Defendant is left-handed. (R. E162) According to defendant, when Denise would not cease talking and making noise while they were having sex, defendant put his right hand across her neck, and shoved her shorts in her mouth. (R. E162-163: E173)

Dr. Donoghue's uncontested expert testimony was that the manner of Denise's death was homicide, caused by strangulation and gagging. (R. E131-132) Dr. Donoghue's uncontested expert testimony also established that, based upon his experience and education, it takes approximately a minimum of four minutes to strangle a person to death, and requires a great amount of force. (R. E132-133) Denise's autopsy revealed numerous external and internal injuries consistent with strangulation. Dr. Donoghuealso testified that based upon the crime scene photos and the autopsy of Denise, she was dead when her attacker left her. (R. E134) The record clearly supports the determination that defendant's killing of Denise was intentional and not reckless, based upon the brutality of the strangulation, which took at least four minutes to *25 accomplish, required a great amount of force, and caused numerous external and internal injuries.

The third factor supporting the trial judge's refusal to give an involuntary manslaughter instruction was the severity of Denise's injuries. The autopsy of Denise's body revealed seventeen external, and six internal. injuries resulting from the beating and strangulation. Clearly. the extent of injury in the instant case shows that defendant knew that his actions created a strong probability of death

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

1998 WL 34289820 (Ill.App. 1 Dist.)
(Cite as: 1998 WL 34289820)

Page 14

or great bodily harm. The fact that it took a minimum of four minutes, and a great amount of force, to strangle Denise undoubtedly negates any inference of reckless-ness.

The fourth factor supporting the trial judge's decision not to give an involuntary manslaughter instruction was that, prior to strangling her to death, defendant punched Denise in the face with a closed fist and then stuffed her own shorts into Denise's mouth. Denise suffered as defendant forced himself upon her, beat her in-to submission, raped her, and kept her quiet by filling her mouth with her shorts, Finally, defendant exerted great force and strangled Denise to death, a death which slowly sapped the life out of Denise over the course of at least four minutes. Clearly, Denise's death did not occur quickly and without great suffer-ing. Thus, the nature and duration of defendant's beating and strangulation of Denise demonstrate that defendant acted intentionally, and support the trial judge's decision not to give an involuntary manslaughter instruction.

Analogously, in *People v. Reeys*, 228 Ill.App.3d 788, 593 N,E.2d 683 (1st Dist. 1992), the defendant contended that the trial court erred when it refused to in-struct the jury on the lesser offense of involuntary manslaughter, and argued that, from the evidence, the jury could have believed the victim's *26 death to have been accidental resulting from reckless acts. The court noted that an invol-untary manslaughter instruction is unnecessary when the nature of the defendant's conduct is of such a character so as to defeat any assertion of reckless or inad-vertent conduct, 228 Ill.App.3d at 799. The court also noted that death may be the natural consequence of blows with bare fists where there is great disparity in size and strength between the two parties. 228 Ill.App,3d at 799. The court stated that the medical evidence showed that the victim died as a result of blunt trauma to the head and manual strangulation, resulting from kicks to the head and neck area or a choke-hold around the neck. 228 Ill.App.3d at 799. The court also stated that the jury could infer from the disparity in sizes of the defendant and the victim that the two would not be evenly matched in a fight, and further noted that the intent to kill or do great bodily harm may be inferred because of the severity of the injuries the victim received. 228 Ill.App.3d at 799. The court stated that, based on this evidence presented at trial, the trial court properly denied an in-struction on involuntary manslaughter. 228 Ill.App.3d at 799. In the instant case, based upon the eleven inch disparity in height, and the approximately 63 pound disparity in weight, between defendant and Denise, and also based upon the sever-ity of Denise's injuries, the trial judge did not abuse his discretion when he denied an instruction on involuntary manslaughter.

Similarly, in *People v. Tainter*, 294 Ill.App.3d 634, 639, 691N.E.2d 55 (1st Dist. 1998), the defendant, angered over his girlfriend's possession of another man's house key, punched his girlfriend in the face, which caused the girlfriend to spin around. As the defendant's girlfriend grabbed onto a dumpster to regain her bal-ance, the defendant swung his leg around to gain momentum and delivered a "round-house" kick to the girlfriend's backside. *27294  Ill.App.3d at 639. When his girlfriend attempted to get up, the defendant again punched her in the jaw,

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

1998 WL 34289820 (Ill.App. 1 Dist.)
(Cite as: 1998 WL 34289820)

causing her to fall to the ground. 294 Ill.App.3d at 639. The defendant then kicked her numerous times in the back and ribs. 294 Ill.App.3d at 639. The girl-friend died a few days later. 294 Ill.App.3d at 628. In affirming the trial court's decision not to instruct the jury on the lesser offense of involuntary manslaughter, the court noted the disparity in size between the defendant and the victim, the duration and brutality of the beating, and the lack of any indication in the record that the victim was able to defend herself. 294 Ill.App.3d at 641-642. Furthermore, the court noted that the medical testimony showed a broken jawbone, that it takes a great deal of force to cause such a fracture, and that the medical testimony also contained evidence of multiple instances of trauma to the victim's head and bruising in her chest and upper abdomen. 294 Ill.App.3d at 642.

In the instant case, the facts provide an even stronger basis for affirmance that those in *Tainter*. First, in *Tainter*, the defendant possessed a seven-inch height advantage over his victim, but weighed twenty-one pounds less than the victim, and was twenty years younger than the victim. In the instant case, the disparity between defendant and Denise included an eleveninch height difference, and an approximate sixty-three pound weight difference. Furthermore, the medical evidence in the instant case, as in *Tainter*, revealed that the victim sustained an injury, or injuries, which required a great deal of force to inflict. In the instant case, the injuries resulted from strangulation, while in *Tainter*, the injury was a broken jawbone.

The aspects of *Tainter* which troubled the dissenting justice do not exist in the instant case. In the instant case, unlike *Tainter*, it is clear *28 that Denise's death directly resulted from defendant's act of strangling her, while in *Tainter*, the dissent noted that the victim was able to get up, walk home, wash her face, and remain ambulatory for a day or two. 294 Ill.App.3d at 648 (Buckley, J., dissenting). The victim in *Tainter* eventually died, but death resulted from a bacterial infection due to the neglected treatment of her broken jaw, not as a direct result of the blows inflicted by the defendant. 294 Ill.App.3d at 648. In *Tainter*, the victim also refused medical treatment, had no broken bones other than the jaw, did not suffer injuries to vital organs, and had no lacerations. 294 Ill.App.3d at 648. Moreover, in *Tainter*, the defendant gave the victim her purse back before he left, indicating he probably did not know death was imminent. 294 Ill.App.2d at 649. In the instant case, defendant immediately began searching for his cocaine bag after he was done with Denise, and then proceeded to find Denise's purse and look through it, dumping items as he went along and keeping those he thought he could sell, which is indicative of knowledge that Denise would not be needing the cocaine or her purse because she was already dead. In fact, defendant attempted to sell her watch, and when he was unable to find a buyer, gave it to his niece.

In *People v. Trotter*, 178 Ill.App.3d 292, 532 N.E.2d 89, the defendant shot an eighty-three year old woman in his care, and police noted upon arrival that the victim was naked, partially covered by a blanket, there were no marks on the victim's hands, the victim's hands were across her chest, there was blood on the

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

1998 WL 34289820 (Ill.App. 1 Dist.)
(Cite as: 1998 WL 34289820)

floor, and a bag of change. 178 Ill.App.2d at 294-295. The defendant argued that he was reckless in approaching the victim in the dark with a gun in his hand, thus permitting her to grab the gun. 178 Ill.App.2d at 299. The court stated the victim suffered a gunshot wound to the head, *29 multiple abrasions on her neck, and a broken neck, and that these injuries demonstrated that the nature of the killing could not have been the result of recklessness. 178 Ill.App.2d at 298. The court also stated the fact that the victim was elderly, had health problems, was found lying naked on the couch, and had no marks on her hands indicating she fought against the defendant by grabbing the gun also demonstrated that the nature of the killing could not have been the result of recklessness. 178 Ill.App.3d at 298. Finally. the court noted that the defendant's conduct demonstrated that the shooting was intentional. After the shooting, the defendant left the victim's house with her gun, ammunition, and money, and proceeded to a friend's house, and then to a liquor store, where he exchanged the victim's change for currency and bought beer and cigarettes. 178 Ill.App.3d at 299.

In the instant case. Denise's seventeen external, and six internal, injuries, most consistent with strangulation and fingernail marks, demonstrate that the killing was not the result of recklessness. This determination is further strengthened by medical testimony establishing that it took, at a minimum, approximately four minutes to strangle Denise. and that a great amount of force was required to do so. Furthermore. defendant's conduct in the instant case belies any claim of recklessness, where defendant admitted to striking Denise numerous times, where defendant admitted stuffing Denise's shorts into her mouth, and where defendant left Denise to search for her purse and the remaining cocaine. Upon finding Denise's purse, defendant kept what he thought he could sell. and tossed other items as he walked away. Moreover. defendant's concocted story of hearing a woman screaming from the parking lot as he returned from Goochies, as well as his statement that he did not say *30 anything when Denise's body was found because police would not let him see the body, further support the determination that defendant acted intentionally,

Assuming. *arguendo*, that error occurred in the instant case, such error was harmless, where the evidence of defendant's guilt was overwhelming, and where an involuntary manslaughter instruction was not available on the felonymurder charges, If evidence is so overwhelming that no rational trier of fact could conclude that the lesser offense was proper, then refusal to give an instruction on the less serious offense is not tantamount to reversible error. *People v. Tucker*, 186 Ill.App.3d 683, 695, 542 N.E,2d 804 (1st Dist. 1989), *See also*, *People v. Baney*, 229 Ill.App.3d 770, 595 N.E.2d 188 (2nd Dist. 1992) (Noting that where a defendant is charged with both first-degree murder and felony murder, any error which occurs in refusing a reckless conduct instruction can only be attributed to the intentional murder count, and that any error was harmless since the reckless conduct instruction was not factually available on the felony-murder charge).

In the instant case, Dr, Donoghue's uncontested expert testimony established that it takes a minimum of four minutes of great force to strangle someone to death,

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

1998 WL 34289820 (Ill.App. 1 Dist.)
(Cite as: 1998 WL 34289820)                                                      Page 17

that Denise's injuries were consistent with strangulation and fingernail marks,
that Denise could not have sat up and motioned to her attacker because she would
have been dead. that Denise's body was posed against the wall by her attacker, and
that Denise was dead when her attacker left, Furthermore, defendant admitted in
his statement he punched Denise, used force to initiate sex, grabbed her around
the throat with his hand, shoved her shorts into her mouth, and looked through her
things and kept a watch he thought he could sell. which he later gave to his
niece. Moreover. when Denise's body was discovered, defendant lied and said that
he had heard a woman screaming from *31 the parking lot as he was returning from a
local establishment on the evening of the murder. Because the evidence against de-
fendant was so overwhelming that no rational jury could conclude that any convic-
tion less than murder was proper, the trial judge's denial of defendant's involun-
tary manslaughter instruction was, if error at all, merely harmless error. Fur-
thermore, any error was harmless since an involuntary manslaughter instruction was
not available on the felony-murder charges.

Defendant was convicted of felony murder based on robbery, and of felony murder
based on aggravated criminal sexual assault. Conviction for felony murder does not
require proof of an independent mental state. *People v. Sandy*, 188 Ill.App.3d 833,
843, 544 N.E.2d 1248 (4th Dist, 1989). Technically, therefore, involuntary man-
slaughter, which involves a reckless mental state, cannot be an included offense
of felony murder. *People v. Sandy*, 188 Ill.App.3d at 843. Thus, even if the trial
judge improperly refused to give defendant's suggested involuntary manslaughter
instruction, the outcome in this case would not have been different as defendant
also was convicted on two separate counts of felony murder.

Defendant's failure to cite any analogous case law in support of his argument
demonstrates the weakness of his position.

In sum, the trial judge properly refused to give an involuntary manslaughter in-
struction where a great disparity in size and strength existed between defendant
and Denise, where defendant's brutal murder of Denise involved stuffing her shorts
into her mouth and strangling her with great force for at least four minutes,
where the severity of Denise's injuries were revealed in the autopsy as consisting
of seventeen observable external injuries and six observable internal injuries,
most consistent with strangulation, and *32 where the nature and duration of de-
fendant's beating and strangulation of Denise negated any possible inference of
recklessness. For all the above reasons, the trial judge did not abuse his discre-
tion in refusing to give an involuntary manslaughter instruction. Assuming, *ar-
guendo*, that error occurred, such error was harmless where evidence against the
defendant was so overwhelming that no rational jury could conclude that involun-
tary manslaughter was proper, and where the outcome of defendant's trial would not
have been different even if an instruction had been given as defendant was con-
victed on two counts of felony murder, which requires no proof of a mental state.
Therefore, this Court should affirm defendant's conviction for first-degree murder.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

1998 WL 34289820 (Ill.App. 1 Dist.)
(Cite as: 1998 WL 34289820)

Page 18

### *33 CONCLUSION

The People of the State of Illinois respectfully request that this Honorable Court affirm defendant's convictions for first-degree murder, aggravated criminal sexual assault, and robbery,

Pursuant to *People v. Nicholls*, 71 Ill. 2d 166, 374 N.E.2d 194 (1978) and relevant statutory provisions 725 ILCS 5/110-7(h)(1992); 725 ILCS 130/12 (1992): 55 ILCS 5/4-2002,1 (1992), the People of the State of Illinois respectfully request that this Court grant the People costs and incorporate as part of its judgment and mandate a fee of $100,00 for defending this appeal. In addition, pursuant to *People v. Agnew*, 105 Ill. 2d 275, 473 N.E,2d 1319 (1985) and 55 ILCS 5/4-2002.1 (1992). the People respectfully request that this Court also grant the People an additional fee of $50.00 in the event oral argument is held in this case.

PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. Raymond EAVES, Defendant-Appellant.
1998 WL 34289820 (Ill.App. 1 Dist.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

SECOND DIVISION
January 12, 1999

No. 1-97-3959

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 93 CR 19046 |
| | ) | |
| RAYMOND EAVES, | ) | Honorable |
| | ) | Paul J. Nealis, |
| Defendant-Appellant. | ) | Judge Presiding. |

O R D E R

Following a jury trial, defendant Raymond Eaves was found guilty of three counts of first degree murder, one count of aggravated criminal sexual assault, and one count of robbery. He was sentenced to a term of natural life in prison on one count of first degree murder, to a consecutive 30-year term for aggravated criminal sexual assault and to a 5-year term for robbery concurrent with the sentence for first degree murder. On appeal, he contends that the trial court wrongly refused to give the jury an instruction for involuntary manslaughter.

The facts are not in dispute: Denise Shelby's severely beaten and strangled body was found in a posed position on July 11, 1993, in a stairwell at an abandoned shopping mall in Harvey, Illinois. Her shorts had been removed and shoved into her mouth,

Exhibit C

1-97-3959

her underpants were around one leg, and her shirt was pushed up exposing one breast. Shelby, who was five feet two inches tall and weighed 97 pounds, had sustained multiple bruises and abrasions; her many internal injuries and defecation at the site were consistent with strangulation. Shelby's purse, cosmetics, and sandals were found nearby.

Medical testimony indicated that it took a minimum of four minutes and required substantial force to kill someone by strangulation. Shelby could not have sat up or pointed at defendant after being strangled.

Defendant's statement to the police a week later indicated that he had agreed to provide cocaine to Shelby in return for sexual favors. They smoked some of the cocaine and Shelby removed her shorts. Defendant forced her down and punched her in the face with a closed fist. While they were having vaginal intercourse, defendant put his right arm across Shelby's neck and stuffed her shorts in her mouth when she began talking loudly. Defendant left as Shelby sat up, mumbled and pointed at him in a threatening manner. He tossed everything from her purse out in the parking lot when he could not find more cocaine and took her watch and some change. He tried unsuccessfully to sell the watch. He returned to the scene when Shelby's body was discovered, but did not know it was her. Defendant was approximately six feet tall and weighed 160 pounds.

Defendant contends that the trial court erroneously refused his request for an involuntary manslaughter jury instruction. He

1-97-3959

maintains that his statement provided the factual basis for such
an instruction, which if believed by the jury would have reduced
the degree of the offense charged.  He claims that his
recollection that Shelby sat upright and threatened him was
sufficient to show that his actions were reckless.  For the
following reasons, we affirm the trial court.

At the jury instruction conference defendant requested a
jury instruction and verdict form for involuntary manslaughter.
The trial court denied the request finding that the evidence did
not support it.  We reject defendant's request that this issue be
reviewed de novo because his credibility was a consideration.
People v. Foskey, 136 Ill. 2d 66, 76 (1990).  Where some evidence
supports a jury instruction for involuntary manslaughter which
would reduce first degree murder to involuntary manslaughter, the
trial court's failure to give it constitutes an abuse of
discretion.  People v. DiVincenzo, 183 Ill. 2d 239, 249 (1998).
Whether such an instruction should be given depends upon the
facts in each case.  People v. DiVincenzo, 183 Ill. 2d at 251.

Involuntary manslaughter requires a less culpable mental
state than first degree murder.  First degree murder is committed
when the accused kills an individual without lawful justification
and knows that his acts create a strong probability of death or
great bodily harm.  720 ILCS 5/9-1(a)(2) (West 1996).
Involuntary manslaughter is committed when the accused performs
acts that are likely to cause death or great bodily harm but
these acts are performed recklessly.  720 ILCS 5/9-3(a) (West

1996).

Whether defendant acted intentionally or recklessly depends on certain factors including the disparity in size and strength between defendant and the victim, the brutality and duration of the beating, the severity of the victim's injuries and whether defendant used a weapon; also the nature of the killing, shown either by multiple wounds or the victim's defenselessness, may show defendant did not act recklessly. People v. DiVincenzo, 183 Ill. 2d at 251.

Here, there was a great disparity in the size and strength of defendant and Shelby, and Shelby sustained a severe beating with cuts and bruises over her entire body. She also suffered multiple internal injuries. Defendant admitted that he forced Shelby to lie down, struck her in the face with a closed fist, stuffed clothing in her mouth to keep her from crying out and placed his arm across her neck to keep her immobile. After battling with Shelby and gagging her, defendant held her down, pressing on her neck for at least four minutes until she no longer moved. With his superior size and strength defendant knew that Shelby could die or suffer great bodily harm. The medical testimony dispelled any notion that Shelby could afterwards have sat up and pointed at defendant. An instruction for involuntary manslaughter is unnecessary when the nature of defendant's conduct is such that it defeats any assertion of reckless or inadvertent conduct. People v. Reeves, 228 Ill. App. 3d 788, 799 .1992). The trial court did not abuse its discretion when it

1-97-3959

refused to give the jury an instruction for involuntary manslaughter.

The mittimus reflects defendant's sentence for first degree murder (count I) but fails to reflect the trial court's sentences for robbery and aggravated criminal sexual assault. We therefore order that the clerk of the circuit court amend the mittimus to indicate that defendant was also sentenced to a consecutive 30-year term for aggravated criminal sexual assault and to a five-year sentence for robbery to be served concurrently with the murder sentence. People v. McCray, 273 Ill. App. 3d 396, 403 (1995); People v. Brown, 255 Ill. App. 3d 425, 438-39 (1993).

Accordingly, the judgment of the trial court is affirmed. As part of our judgment, we grant the State's request and assess defendant $100 as costs for this appeal.

Judgment affirmed, mittimus corrected.

GORDON, P.J., with RAKOWSKI and McNULTY, JJ., concurring.

NO.  **8 7 0 4 6**

# ORIGINAL

| | | |
|---|---|---|
| People State of Illinois, | ) | Appellate Court, First District, |
| | ) | No. 1-97-3959 |
| Respondent | ) | |
| | ) | Circuit Court, Cook County, |
| v. | ) | No. 93-CR-19046 |
| | ) | |
| Raymond Eaves, | ) | Hon. Paul J. Nealis, |
| | ) | Judge Presiding |
| Petitioner | ) | |

## PETITION FOR LEAVE TO APPEAL

# FILED

**FEB – 9 1999**

**SUPREME COURT CLERK**

Raymond Eaves
Reg. No. N-28319
P. O. Box 711
Menard, IL 62259



Exhibit D

NO. _____ 2 _____

## IN THE SUPREME COURT OF THE STATE OF ILLINOIS

| | |
|---|---|
| PEOPLE OF THE STATE OF ILLINOIS, )<br>)<br>Respondent )<br>)<br>)<br>)<br>)<br>)<br>    v.        )<br>)<br>RAymond EAVES.     )<br>)<br>)<br>)<br>Petitioner )<br>)<br>)<br>)<br>) | PETITION FOR LEAVE TO<br>APPEAL FROM THE<br>APPELLATE COURT OF<br>ILLINOIS,<br>DISTRICT<br>No: 97-3959<br><br>THERE HEARD ON APPEAL<br>FROM THE CIRCUIT COURT<br>FOR THE Cook County<br>JUDICIAL CIRCUIT,<br>            COUNTY,<br>ILLINOIS.<br><br>THE HONORABLE.<br>Paul J. Nealis<br>JUDGE, PRESIDING. |

### PETITION FOR LEAVE TO APPEAL

TO THE HONORABLE JUSTICE OF THE SUPREME COURT OF THE

STATE OF ILLINOIS:

May it please the Court:

### I.

### PRAYER FOR LEAVE TO APPEAL

Your Petitioner, Raymond EAVES , Pro se, respectfully

petitions this Honorable Court for Leave to Appeal pursuant

to Supreme Court Rule 315, from the judgement of the

Appellate Court of Illinois, First ___ District , which

affirmed the judgement of conviction entered by the Circuit

Court of ___ Cook ___ County, Illinois upon the

____ Jury trial _____ finding petitioner guilty of

First Degree Murder _____ .

SD428 MCC

II.

OPINION AND PROCEEDINGS BELOW

On _October 16_ , 19_97_ Petitioner was
found guilty of _First Degree Murder_ . Petitioner
was subsequently sentenced to a _Natural Life_ year
prison term upon his conviction.  He appealed this
conviction to the Illinois Appellate Court, _First_
District. On ~~October 20~~ _January 12, 1999_ , 19~~97~~ the Court delivered
its opinion in said appeal, affirming the judgment of
conviction and sentence. No petition for hearing was filed.

III.

## POINTS RELIED UPON FOR REVERSAL

The Trial Court Erroneously REFUSED MR. EAVES'
INVOLUNTARY MANSLAUGHTER INSTRUCTION.

SD428 MCC

IV.

STATEMENT OF FACTS

" SEE ATTACHED PAGE "

SD428 MCC

STATEMENT OF FACTS

## Introduction

On July 11, 1993, Denise Shelby's partially clad body was found in the abandoned Dixie Square Mall. (E30) On September 29, 1997, Raymond Eaves went before a jury charged with murder, aggravated criminal sexual assault, robbery, and other charges.

The prosecution presented the testimony of victim's mother Mildren Jefferson (life and death), Harvey police officer Andrew Bell, Detective William Applewhite, crime technician Paul Smith, crime lab analyst Angela Reich, forensic pathologist Edmund Donoghue, and Assistant State's Attorney Christopher Cummings. The prosecution rested and the defense rested.

## Police Find the Body and Investigate the Scene

On July 11, 1993, Harvey police officer Andrew Bell received a call that a body had been found in the abandoned Dixie Square Mall. (E29)  The officer located the body at the mall and he and Detective Applewhite described it as follows: it was unclothed from the waist down, except that her panties were around one leg, (E30, E41) her shirt was pushed up, (E41) a pair of walking shorts were balled up and shoved into her mouth, (E57) there were bruises on her neck, shoulder, face and chest, (E57), her butt was up against a wall, and one leg was up against the wall, bent at the knee, (E57) there was excrement on the floor near the decedent's anus. (E57)

3

Illinois State Police crime technician Paul Smith testified there was "no evidence" of a struggle at the scene where the body was found, but also testified he could not rule out "any struggle whatsoever" at the spot. (E88-E89) Technician Smith opined that the excrement on the floor near the body indicated that she had died at that spot. (E90)

Detective Willie Applewhite testified that some 300 feet north of the mall he found a purse, comb, mascara tube, a blue pen, a pink hairbrush, and a bottle of Ultra Sheen. (E61-E62) At a distance of 175 feet north of the mall he found a pair of sandals, a silver pipe, and three white buttons with threads attached. (E59, E62)

## The Medical Examiner

Forensic pathologist Edmund Donoghue testified he observed seventeen injuries and abrasions on the decedent's face, neck, back, and leg. (E104) Abrasions at the base of the neck were consistent with fingernails and with strangulation. (E110, E111) Internal neck injuries were also consistent with strangulation. (E115) Dr. Donoghue testified the decedent had used cocaine shortly before her death, and had died by strangulation and gagging; an event which would take at least four minutes to accomplish. (E115, E132) The uncomfortable posture of the body indicated that she was probably dead when the defendant left her. (E134)

4

## The Police Arrest Mr. Eaves

Detective Applewhite spoke with Raymond's brother, a Harvey police inspector, and then went to 15708 Park Ave., looking for Raymond. (E41-E42)  According to Detective Applewhite: Raymond Eaves a) said he'd recently given a ladies watch to his niece, Mecca, and b) agreed to bring himself and the watch into the police station. (E43-E45) Again, according to Detective Applewhite, victim Denise Shelby's father identified the watch as having belonged to Denise. (E46)

## Mr. Eaves' Statement

Assistant State's Attorney Christopher Cummings testified Mr. Eaves provided him the following court-reported statement: (E152)

Mr. Eaves saw Denise Shelby "walking back and forth".  She agreed to provide sexual favors in return for cocaine. (E156) Mr. Eaves purchased two bags and the two of them went to the abandoned Dixie Square Mall. (E157) When she resisted going to the mall he grabbed her and hit her, she hit him back, and he told her she would have to go through with the bargain or lose the cocaine. (E158)

He let her go and they entered the building. She removed her shorts and they smoked a bag of cocaine. (E158-E160) Mr. Eaves leaned on her to go back, she resisted going back, and Mr. Eaves hit her and had sex with her. (E162) Denise Shelby kept telling him to hurry up and he shoved her shorts in her mouth and put an arm on her neck. (E163)  Mr. Eaves finished,

5

and Denise Shelby mumbled and pointed a finger at him as if to
threaten him. (E164) Mr. Eaves walked out of the mall, found
her purse in the parking lot, and removed some change and a
watch. (E165)  He tried and failed to sell the watch to drug
dealers and later gave it to his niece. (E167)

### DNA Analysis

Illinois State Police crime lab technician testified the
DNA found in decedent's vagina matched that of Mr. Eaves and
one in 1-3 million blacks. (F41-F43)

### Jury Instructions

The trial court denied defendant's proffered involuntary
manslaughter instruction. (F69)

### Finding and Sentencing

The jury found Mr. Eaves as charged. (F164) The trial
court imposed a natural life term on the murder, consecutive to
a thirty-year term on the aggravated criminal sexual assault,
and concurrent to a five-year term on the robbery. (G56)

V.

<u>ARGUMENT</u>

SEE ATTACHED PAGE

SD428 MCC

ARGUMENT

I.

THE TRIAL COURT ERRONEOUSLY REFUSED MR.
EAVES' INVOLUNTARY MANSLAUGHTER
INSTRUCTION.

In Mr. Eaves' court-reported statement, published by
Assistant State's Attorney Christopher Cummings, defendant
reported that he purchased sex from Denise Shelby, that she
began talking loudly and telling him to hurry up, and that he
then shoved her shorts into her mouth and put his arm across
her neck. (E163)  According to Mr. Eaves' statement, as he left
the area Denise Shelby was mumbling and pointing at him in a
threatening manner. (E164)  The aforementioned evidence
provided a sufficient basis for an involuntary manslaughter
instruction and the trial court's refusal to so instruct the
jury denied Mr. Eaves a fair trial.

The issue presents a matter of law for which a de novo
standard of review applies. People v. Foskey (1990), 136
Ill.2d 66, 554 N.E.2d 192.

The defendant is entitled to instructions on his theory of
the case. People v. Lefler (1967), 38 Ill.2d 216, 230 N.E.2d
827.

An involuntary manslaughter instruction is appropriate
where evidence in the record, if believed by the jury, would
reduce the degree of the offense charged. Basically, there must
be evidence in the record which would cause a jury to believe
that the defendant acted recklessly instead of knowingly in

7.

causing the death [of the victim.]   People v. Johnson
(3d Dist. 1990), 197 Ill.App.3d 74, 554 N.E.2d 696.

Recklessness is defined as follows by the Criminal Code:

A person is reckless or acts recklessly, when he
consciously disregards a substantial and unjustifiable risk
that circumstances exist or that a result will follow,
described by the statute defining the offense; and such
disregard constitutes a gross deviation from the standard of
care which a reasonable person would exercise in the situation.
An act performed recklessly is performed wantonly, within the
meaning of a statute using the latter term, unless the statute
clearly requires another meaning. 720 ILCS 5/4-6.

In the instant case, the medical examiner testified it
death by strangulation and gagging would have taken at least
four minutes (E132) and that Denise Shelby's posture indicated
she was likely dead when Mr. Eaves left the room. (E134)

Mr. Eaves' statement to Assistant State's Attorney
Christopher Cummings, on the other hand, suggests that in the
midst of an on-again-off-again sex for drugs transaction and
after they both had ingested cocaine, Denise Shelby kept
"talking loudly"; Mr. Eaves consequently filled her mouth with
her shorts and leaned on her throat, presumably to keep her
quiet; and Denise Shelby was alive and gesturing angrily at him
when he left the scene. (E163-E164)

In the instant case the medical examiner's suggestion of a
deliberate four-minute strangulation may sound more credible
than Mr. Eaves' description of a relatively brief obstruction

of decedent's airways for the purposes of "shutting her up."
Issues of credibility are, however, for the jury, and it
therefore appears that this court must either take on that
function itself or remand the case for a new trial in which Mr.
Eaves theory of the defense may be presented.

Resppectfully Sumitted,

Raymond Eaves
N28319
Menard C C
P.O. Box 711
Menard, Illinois
                    62259

STATE OF ILLINOIS
SUPREME COURT

At a Term of the Supreme Court, begun and held in Springfield, on Monday, the eighth day of March, 1999.

Present: Charles E. Freeman, Chief Justice
Justice Benjamin K. Miller        Justice Michael A. Bilandic
Justice James D. Heiple           Justice Moses W. Harrison II
Justice Mary Ann G. McMorrow      Justice S. Louis Rathje

---

On the thirty-first day of March, 1999, the Supreme Court entered the following judgment:

No. 87046

People State of Illinois,

    Respondent

    v.

Raymond Eaves,

    Petitioner

Petition for Leave
to Appeal from
Appellate Court
First District
1-97-3959
93CR19046

The Court having considered the Petition for leave to appeal and being fully advised of the premises, the Petition for leave to appeal is DENIED.

As Clerk of the Supreme Court of the State of Illinois and keeper of the records, files and Seal thereof, I certify that the foregoing is a true copy of the final order entered in this case.

IN WITNESS WHEREOF, I have hereunto subscribed my name and affixed the Seal of said Court, this twenty-second day of April, 1999.

Clerk,
Supreme Court of the State of Illinois

Westlaw.

712 N.E.2d 820 (Table)
183 Ill.2d 578, 712 N.E.2d 820 (Table), 238 Ill.Dec. 716
(Cite as: 183 Ill.2d 578, 712 N.E.2d 820 (Table))

Page 1

**H**
People v. Eaves
Ill. 1999.
(The decision of the Court is referenced in the
North Eastern Reporter in a table captioned
"Supreme Court of Illinois Dispositions of Petitions
for Leave to Appeal".)

Supreme Court of Illinois
People
v.
Raymond Eaves
**NO. 87046**

MARCH TERM, 1999
March 31, 1999

Lower Court: No. 1-97-3959

Disposition: Denied.

Ill. 1999.
People v. Eaves
183 Ill.2d 578, 712 N.E.2d 820 (Table), 238
Ill.Dec. 716

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Exhibit E

No. 1-05-3406

## IN THE

## APPELLATE COURT OF ILLINOIS

## FIRST DISTRICT

| | | |
|---|---|---|
| **PEOPLE OF THE STATE OF ILLINOIS,** | ) | Appeal from the Circuit Court of Cook County, Illinois. |
| Respondent-Appellee, | ) | |
| | ) | |
| -vs- | ) | No. 93 CR 19046. |
| | ) | |
| **RAYMOND EAVES,** | ) | Honorable |
| | ) | Paul J. Nealis, |
| Petitioner-Appellant. | ) | Judge Presiding. |

## BRIEF AND ARGUMENT FOR PETITIONER-APPELLANT

MICHAEL J. PELLETIER
Deputy Defender

DOUGLAS R. HOFF
Assistant Appellate Defender
Office of the State Appellate Defender
203 North LaSalle Street - 24th Floor
Chicago, Illinois  60601
(312) 814-5472

COUNSEL FOR PETITIONER-APPELLANT

## ORAL ARGUMENT REQUESTED



RECEIVED
ORAL [illegible]
JUL 2 5 2006

Exhibit F

POINTS AND AUTHORITIES                                    Page

**Eaves' consecutive sentence of 30 years imprisonment for aggravated criminal sexual assault is void, since no sentence can be served consecutively to a natural life term, such as the one the trial court imposed for first degree murder.** ........... <u>5</u>

*People v. Palmer*, 218 Ill. 2d 148, 843 N.E.2d 292 (2006) ........................ 5

### Standard of Review

*People v. Garriott*, 253 Ill.App.3d 1048, 625 N.E.2d 780 (4th Dist. 1993) ............ 5

*People v. Arna*, 168 Ill. 2d 107, 658 N.E.2d 445 (1995) .......................... 5

*People v. Simmons*, 256 Ill. App. 3d 651, 628 N.E.2d 759 (1st Dist. 1993) ............ 5

### Consecutive Sentencing

*People v. Palmer*,  218 Ill. 2d 148, 843 N.E.2d 292 (2006)  ........................ 6

730 ILCS 5/5-8-4(a) (West 2002) ........................................ 6

*People v. Dixon*, 2006 Ill. App. LEXIS 425 (1st Dist. May 30, 2006) ................ 6

Ill. Sup. Ct. Rule 615(b)(4) ................................................. 7

## NATURE OF THE CASE

Raymond Eaves, petitioner-appellant, appeals from a judgment dismissing his petition for post-conviction relief. No issue is raised concerning the charging instrument.

## ISSUE PRESENTED FOR REVIEW

Whether Eaves' consecutive sentence of 30 years imprisonment for aggravated criminal sexual assault is void, since no sentence can be served consecutively to a natural life term, such as the one the trial court imposed for first degree murder.

# JURISDICTION

Raymond Eaves, petitioner-appellant, appeals the dismissal of his post-conviction petition. The judgment being appealed was entered on October 17, 2005 (PC C. 79).[1] Notice of appeal was timely filed on October 19, 2005 (PC C. 82). Jurisdiction therefore lies in this Court pursuant to Article VI, Section 6, of the Illinois Constitution, and Supreme Court Rule 651 (a).

---

[1] The record on appeal will be cited to as follows: post-conviction common-law record, "PC."

## STATEMENT OF FACTS

Appellant Raymond Eaves was convicted after jury trial of first degree murder, aggravated criminal sexual assault, and robbery (PC C. 5). All of the charges arose from an incident involving the death of Denise Shelby on July 11, 1993 in Harvey, Illinois (C. 5). The trial court sentenced Eaves to a term of natural life imprisonment for the first degree murder count, 30 years imprisonment for the aggravated criminal sexual assault and five years imprisonment for the robbery count (PC. C. 5). The trial court ordered that the 30 year term be served consecutive to the life imprisonment term and that the five year term be served concurrently (PC. C. 5).

On January 12, 1999, this Court affirmed Eaves' convictions and sentences, but remanded because the mittimus did not reflect the aggravated criminal sexual assault and robbery convictions. *People v. Raymond Eaves*, No. 1-97-3959 (1st Dist. January 12, 1999) (*Unpublished Order* at 5 (PC. C. 9). Eaves filed a petition for post-conviction relief on October 5, 1999 (PC C. 13-19). Counsel was appointed, and two supplemental petitions were filed (PC. C. 23-43). Post-conviction counsel also filed a certificate pursuant to Ill. Sup. Ct. Rule 651(c) (PC C. 45-71). The State filed a motion to dismiss on October 17, 2005, which the trial court granted that same day (PC C. 72-79). Notice of appeal was timely filed on October 19, 2005 (PC C. 80).

## ARGUMENT

**Eaves' consecutive sentence of 30 years imprisonment for aggravated criminal sexual assault is void, since no sentence can be served consecutively to a natural life term, such as the one the trial court imposed for first degree murder.**

In this case, the trial court imposed consecutive prison terms of natural life for first degree murder and thirty years for aggravated criminal sexual assault (PC C. 5). The court also imposed a term of five years imprisonment for robbery, to be served concurrently with the natural life term (PC C. 5). Under *People v. Palmer*, 218 Ill. 2d 148, 843 N.E.2d 292 (2006), no term of imprisonment can be imposed consecutively to a natural life term. Therefore, the consecutive portion of Eaves' sentence for aggravated criminal sexual assault is void and this Court should vacate and order that the sentences be served concurrently.

### Standard of Review

The issue presented is purely one of law -- whether Eaves' sentence was imposed in compliance with the applicable statute – and this Court will, therefore, review it *de novo*. *People v. Garriott*, 253 Ill.App.3d 1048, 1050, 625 N.E.2d 780 (4th Dist. 1993). Eaves notes that he did not raise this issue in his post-conviction petition, but a sentence that is imposed in violation of statute is void and can be challenged at any time. *Palmer*, 218 Ill. 2d at 154; *People v. Arna*, 168 Ill. 2d 107, 658 N.E.2d 445 (1995); *People v. Simmons*, 256 Ill. App. 3d 651, 652, 628 N.E.2d 759 (1st Dist. 1993). In this case, Balle's 30 year sentence for aggravated criminal sexual assault is void because it was improperly imposed consecutive to a natural life term. Since it is void, there is no procedural bar to him raising this issue in this Court.

## Consecutive Sentencing

The trial court erred when it imposed consecutive prison terms of natural life for first

degree murder and thirty years for aggravated criminal sexual assault (PC C. 5). In *People v.*

*Palmer*, 218 Ill. 2d 148, 163, 843 N.E.2d 292 (2006), the defendant argued, *inter alia*, that the

trial court erred in imposing two consecutive terms of natural life imprisonment. The court

agreed, noting that another term of imprisonment cannot be served consecutive to that of a

natural life term because, obviously, the defendant cannot be released at the end of the natural

life term and, therefore no other sentence could be served after it:

> [W]e recognize the impossibility of serving consecutive natural-life sentences both
> according to natural law and within the plain meaning of the "consecutive" sentencing
> law, section 5-8-4(a). 730 ILCS 5/5-8-4(a) (West 2002). This impossibility is based
> upon the critical distinction between a term of natural life imprisonment and that of a
> term of years, namely, the particular sentences' potential for release of defendant.

* * *

> It belabors the obvious to state that at the end of a defendant's first natural life sentence,
> his life is over. Further, the Department of Corrections cannot enforce an order imposing
> another natural-life sentence consecutive to it.

*Id.* at 165. Thus, the *Palmer* court held, the portion of the defendant's sentence that directed his

second natural life term to be served consecutively to his first natural life term was void and had

to be changed so that the sentences would be served consecutively. *Id.* at 154, 170.

This Court applied the *Palmer* decision to a situation in which the defendant was

sentenced to a term of years consecutive to a natural life sentence in *People v. Dixon*, 2006 Ill.

App. LEXIS 425 (1ˢᵗ Dist. May 30, 2006). In *Dixon*, the defendant was sentenced to a natural life

term of imprisonment for first degree murder, and a consecutive term of 30 year term for armed

robbery. *Dixon*, 2006 Ill. App. LEXIS 425 at *2. He argued on appeal that *Palmer* precluded

consecutive sentencing and that his sentence was therefore void. *Dixon*, 2006 Ill. App. LEXIS 425 at *15. The State conceded error. *Id.* at *17-18. This Court agreed with the defendant, and citing *Palmer,* ordered that Dixon's sentence to be run concurrent, pursuant to its supervisory authority under Ill. Sup. Ct. Rule 615(b)(4). *Dixon*, 2006 Ill. App. LEXIS 425 at *18.

This case is effectively indistinguishable from *Dixon*, and this Court should, therefore, vacate Eaves' consecutive sentence for aggravated criminal sexual assault and order that it be served concurrently.

## CONCLUSION

For the foregoing reasons, Raymond Eaves, Petitioner-Appellant, respectfully requests that this Court exercise its authority under Ill. Sup. Ct. Rule 615(b)(4) and direct that his 30 year sentence for aggravated criminal sexual assault be served concurrently with his natural life sentence for first degree murder.

Respectfully submitted,

MICHAEL J. PELLETIER
Deputy Defender

DOUGLAS R. HOFF
Assistant Appellate Defender
Office of the State Appellate Defender
203 North LaSalle Street - 24th Floor
Chicago, Illinois  60601
(312) 814-5472

COUNSEL FOR PETITIONER-APPELLANT

## APPENDIX TO THE BRIEF

Index to the Record . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-1

Certified Report of Disposition . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-4

Notice of Appeal . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-5

## INDEX TO THE RECORD

**Common Law Record ("C")**                                                                  **Page**

Memorandum of Orders ("Half Sheet") . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 10

Mandate from the Appellate Court (May 25, 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

Rule 23 Order (97-3959)(May 25, 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*Pro Se* Petition for Post-Conviction Relief (October 5, 199) . . . . . . . . . . . . . . . . . . . . . . . . 14

State's Motion to Dismiss (January 28, 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

Partial Supplemental Post-Conviction Petition (June 25, 2001) . . . . . . . . . . . . . . . . . . . . . . 24

State's Motion to Dismiss, the Partial Supplemental Post-Conviction Petition (October 25, 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

Second Supplemental Post-Conviction Petition (September 15, 2005) . . . . . . . . . . . . . . . . . . 46

Harvey Police Persons Incident Report . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 61-71

State's Motion to Dismiss Petitioner's Second Supplemental Petition (October 17, 2005) . . . 72

Attorney's 651 (c) certificate (October 17, 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 78

Certified Report of Disposition (October 18, 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 79

Notice of Appeal (October 19, 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 80

**Direct Appeal**
**Report of Proceedings ("SR")**

|  |  | **Direct** | **Cross** | **Redir.** | **Recr.** |
|---|---|---|---|---|---|
| September 19, 1994 - Arguments |  |  |  |  |  |
| Mr. Rago - Defense |  |  |  |  | 11 |
| Ms. Jennings - State |  |  |  |  | 14 |
| February 13, 1996 - Continuance |  |  |  |  | 28 |
| May 14, 1996 - Motion to Quash Arrest and Suppress Evidence |  |  |  |  |  |
| Defense | Raymond Eaves | 36 | 38 | 55 |  |
| Defense Rests |  |  |  |  | 56 |

|  |  | **Direct** | **Cross** | **Redir.** | **Recr.** |  |
|---|---|---|---|---|---|---|
| State | Willy Applewhite | 57 | 70 | 77 |  |  |

Examination by the Court 79

State Rests 81

Arguments

      Mr. Rago - Defense 81

      Ms. Jennings - State 82

      Mr. Rago - Defense 85

Motion to Quash Arrest and Suppress Evidence - Denied 94

September 11, 1996 - Motion to Preclude the
Death Penalty - Denied 114

Motion to Call the Illinois Death Penalty
Unconstitutional - Denied 122

Motion for a Hearing on Proportionality -
Denied 124

Motion to Preclude the State from Death Qualifying a Potential Jury or, in the
Alternative, Motion for a Hearing to Determine that there is a Substantial
Probability that the Defendant is Eligible for the Death Penalty - Denied 131

Motion for Individual Voir Dire and
Sequestration of the Jurors During te Voir
Dire - Granted 134

Motion for Attorney Participation in the Voir
Dire - Granted in Part 136

Standard Procedure in Regards to the
Witherspoon Questions - Denied 139

Motion for Discovery and Bill of Particular as
to Aggravation - Allowed 142

Motion to Reopen Voir Dire - Denied 149

Motion to Allow the Right of Allocution -
Denied 155

August 4, 1997

|                                                                                  | **Direct** | **Cross** | **Redir.** | **Recr.** |       |
|----------------------------------------------------------------------------------|:----------:|:---------:|:----------:|:---------:|------:|
| Signed Jury Waiver                                                                |            |           |            |           | 175   |
| **Guilty Plea No. 93 CR-19046-01**                                                |            |           |            |           | 178   |
| Leave to Withdraw the Jury Waivers – Allowed                                      |            |           |            |           | 181   |
| September 24, 1997                                                                |            |           |            |           |       |
| Signed Jury Waiver                                                                |            |           |            |           | 186   |
| Waiver of a Jury for the Eligibility Phase after the Aggravation and Mitigation Phase |       |           |            |           | 188   |
| October 17, 1997                                                                 |            |           |            |           |       |
| Sentencing Hearing                                                               |            |           |            |           |       |
|     Argument in Aggravation                                    |            |           |            |           | 194   |
|     Argument in Mitigation                                     |            |           |            |           | 201   |
|     Argument in Aggravation                                    |            |           |            |           | 219   |
| Imposition of Sentence                                                           |            |           |            |           | 245   |

## IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
### COUNTY DEPARTMENT - CRIMINAL DIVISION

PEOPLE OF THE STATE OF ILLINOIS )
                                     )
                                     )    CASE NO.

           VS.                )    PC_93CR-19046-01
                                     )

RAYMOND EAVES                  )

### CERTIFIED REPORT OF DISPOSITION

The following disposition was rendered before the Honorable Judge _PAUL NEALIS:_

OCTOBER 17, 2005: STATE FILES MOTION TO DISMISS PETITIONERS SECOND SUPPLEMENTAL

POST CONVICTION PETITION. 651C ON FILE. ARGUMENTS HEARD. ALL P.C. AND

SUPPLEMENTAL POST CONVICTION PETITIONS ARE DISMISSED.

I hereby certify that the foregoing has been entered of record
on the above captioned case.

Date:     OCTOBER 18, 2005

_Dorothy Brown_

DOROTHY BROWN, Clerk of the Circuit Court

CLERK OF THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS

FILE/POSTCONVICTION3.WP

TO THE APPELLATE COURT OF ILLINOIS
IN THE CIRCUIT COURT OF COOK COUNTY
CRIMINAL DIVISION

PEOPLE OF THE STATE OF ILLINOIS )    NO. 93CR19046
                                 )    P. C. Judge: Paul Nealis
        vs.                      )    Atty. Winona J. Agbabiaka
                                 )            Assistant Public Defender
RAYMOND EAVES                    )

## NOTICE OF APPEAL

An Appeal is taken from the order of judgment described below:

APPELLANT'S NAME:   RAYMOND EAVES N-28319

IR# 809925                    D.O.B.  08/16/1958

APPELLANT'S ADDRESS:    Menard Correctional Center
                        P.O. Box 711
                        Menard, Illinois 62259

APPELLANT'S ATTORNEY:    State Appellate Defender
ADDRESS:   100 W.  Randolph, Suite 5-500, Chicago, Illinois  60606
OFFENSE:   MURDER, ACSA, ROBBERY
JUDGMENT:  **DENIAL OF POST CONVICTION RELIEF**
DATE:         10/17/05
SENTENCE:   LIFE; CONSECUTIVE TO 30;CONCURRENT WITH 5

**FILED**
D6-108
OCT 19 2005
DOROTHY BROWN
CLERK OF THE CIRCUIT COURT
OF COOK COUNTY, IL

APPELLANT'S ATTORNEY

**VERIFIED PETITION FOR REPORT OF PROCEEDINGS COMMON LAW RECORD
AND FOR APPOINTMENT OF COUNSEL ON APPEAL FOR INDIGENT DEFENDANT**
Under Supreme Court Rules 60-608, appellant asks the Court to order the official Court
Reporter to transcribe an original and copy of the proceedings, file the original with the Clerk
and deliver a copy to the appellant; order the Clerk to prepare the Record on Appeal and to
Appoint State Appellate Defender Counsel on Appeal.  Appellant, being duly sworn, says
that at the time of his conviction he was and is unable to pay for the Record or an Appellate
Counsel for appeal.

APPELLANT

SUBSCRIBED and SWORN TO THIS _____
DAY OF _____, 2005

_____
NOTARY PUBLIC

## ORDER

IT IS ORDERED the State Appellate Defender be appointed as counsel on appeal and the
Record and Report of Proceedings be furnished appellant without cost.  Dates to be
transcribed:

PRE HEARING DATE(S) _____          OTHER
HEARING DATE(S) ___10-17-05___
10/17/05
DATE:   10-19-05                    ENTER: _____
                                              JUDGE

NO. 05-3406

IN THE

APPELLATE COURT OF ILLINOIS

FIRST JUDICIAL DISTRICT

---

PEOPLE OF THE STATE OF ILLINOIS,

Respondent-Appellee,

vs.

RAYMOND EAVES,

Petitioner-Appellant.

---

Appeal from the Circuit Court of Cook County, Criminal Division.
Honorable **Paul Nealis**, Judge Presiding.

BRIEF AND ARGUMENT FOR
RESPONDENT-APPELLEE

---

RICHARD A. DEVINE
State's Attorney
County of Cook
Room 309 - Richard J. Daley Center,
Chicago, Illinois 60602

Attorney for Respondent-Appellee

JAMES FITZGERALD,
ANTHONY O'BRIEN,
TAMERLA ELEBY,
Assistant State's Attorneys,
Of Counsel.

Exhibit G

IN THE

APPELLATE COURT OF ILLINOIS

FIRST JUDICIAL DISTRICT

PEOPLE OF THE STATE OF ILLINOIS,

                                      Respondent-Appellee,

                     vs.

RAYMOND EAVES,

                                      Petitioner-Appellant.

## POINTS AND AUTHORITIES

### I.

**DEFENDANT'S CONSECUTIVE SENTENCE OF THIRTY YEARS IMPRISONMENT FOR AGGRAVATED CRIMINAL SEXUAL ASSAULT SHOULD BE MODIFIED TO RUN CONCURRENTLY WITH THE TRIAL COURT'S IMPOSED NATURAL LIFE SENTENCE......................**    **4**

People v. Palmer, 218 Ill. 2d 148,
     843 N.E.2d 292 (2006) ...........................................................    4

People v. Dixon, 2006 Ill. App. LEXIS 425 (1st Dist. 2006).........................    4,5

1

## ISSUE PRESENTED FOR REVIEW

WHETHER EAVES' CONSECUTIVE SENTENCE OF THIRTY YEARS IMPRISONMENT FOR AGGRAVATED CRIMINAL SEXUAL ASSAULT IS VOID, SINCE NO SENTENCE CAN BE SERVED CONSECUTIVELY TO A NATURAL LIFE SENTENCE, SUCH AS THE ONE IMPOSED FOR FIRST DEGREE MURDER.

## STATEMENT OF FACTS

A grand jury indicted defendant, Raymond Eaves, on sixteen counts of first-degree murder, seven counts of aggravated criminal sexual assault, one count of criminal sexual assault, five counts of aggravated kidnapping, one count of robbery, two counts of kidnapping, and one count of unlawful restraint.  (C.R. 8-40)  Following a jury trial, defendant was found guilty of three counts of first-degree murder, aggravated criminal sexual assault, and robbery.  (C.R. 194-198; R. F 164)  The trial court then imposed a natural-life sentence on defendant to be served in the Illinois Department of Corrections on the first-degree murder conviction, a consecutive thirty-year term of imprisonment on the aggravated criminal sexual assault conviction, and a concurrent five-year term of imprisonment on the robbery conviction.  (R. 56 G) Defendant's convictions were affirmed on appeal on January 12, 1999.

On October 5, 1999, defendant filed his *pro se* petition for post-conviction relief in which he stated many allegations concerning violations of his constitutional rights. (R. C 14)  On June 25, 2001, defendant filed a partial supplemental post-conviction petition for relief in which defendant alleged that his consecutive sentences for murder and aggravated sexual assault violated Apprendi v. New Jersey, and must be vacated and resentenced to concurrent terms.  (R. C 28) On April 25, 2003, the trial court dismissed without prejudice defendant's partial supplemental post-conviction petition for relief.  (R. C 44, R.CL Vol. I. S-3) The record suggests that the dismissal resulted from clerical errors. (R. C 44)

2

On September 15, 2005, defendant filed a second supplemental petition for post-conviction relief alleging that he was denied his sixth amendment right to a fair trial, he was denied his right to due process, and he was denied his right to effective assistance of counsel. (R. C 46) On October 17, 2005, the trial court properly granted the People's motion to dismiss defendant's second supplemental post-conviction petition, and defendant's *pro se* petition for post-conviction relief (filed October 5, 1999). (R. DD-21) From that dismissal defendant appeals.

## ARGUMENT

### I.

**DEFENDANT'S CONSECUTIVE SENTENCE OF THIRTY YEARS IMPRISONMENT FOR AGGRAVATED CRIMINAL SEXUAL ASSAULT SHOULD BE MODIFIED TO RUN CONCURRENTLY WITH THE TRIAL COURT'S IMPOSED NATURAL LIFE SENTENCE.**

Defendant contends that the trial court erred when it imposed consecutive prison terms of natural life for the first degree murder conviction and a thirty-year sentence for aggravated criminal sexual assault conviction. (Deft. Br. 6)

The People agree with defendant that no term of imprisonment can be imposed consecutively to a natural life term. The People also agree that defendant's consecutive sentence of thirty years for aggravated criminal sexual assault is void and should be modified to run concurrently with the trial court's imposed sentence of natural life.

Defendant's argument that his thirty-year sentence should be modified to run concurrently with his natural life sentence is based on the Illinois Supreme Court's ruling in People v. Palmer, 218 Ill. 2d 148, 843 N.E.2d 292 (2006), and the Illinois Appellate Court's ruling in People v. Dixon, 2006 Ill. App. LEXIS 425 (1st Dist. 2006). In Palmer, the Supreme Court held that no term of imprisonment can be imposed consecutively to a natural life term. Palmer, 218 Ill. 2d at 151. A consecutive sentence has been defined as "two or more sentences of jail time to be served in sequence…" Palmer, 218 Ill. 2d at 167. The court noted that absent the death penalty, it is not possible to punish the defendant more harshly. Palmer, 218 Ill. 2d at 168. The court reasoned that a defendant with a natural life sentence will serve no more or no less than the rest of his life in jail. Palmer, 218 Ill. 2d at 169. In Dixon, the appellate court further

4

explained the Palmer principle and held that the defendant's thirty-year consecutive sentence for armed robbery to be served after his natural life sentence was void and the two sentences should be ordered to run concurrently. People v. Dixon, 2006 Ill. App. LEXIS 425, 18 (1st Dist. 2006).

In this case, defendant was convicted of three counts of first degree murder, aggravated criminal sexual assault, and robbery. As a result, defendant was sentenced to a natural life term of imprisonment on the first degree murder conviction, a consecutive thirty-year term on the aggravated criminal sexual assault, and a concurrent five-year term on the robbery conviction. Therefore, defendant's thirty-year sentence for aggravated criminal sexual assault should be voided and ordered to run concurrently with the natural life sentence imposed by the trial court.

In sum, defendant's natural life imprisonment sentence for first degree murder, and concurrent five-year term for robbery should be affirmed. However, defendant's thirty-year consecutive sentence for aggravated criminal sexual assault is void. Pursuant to Illinois Supreme Court Rule 615, this Court should modify defendant's sentence on his aggravated criminal sexual assault conviction to run concurrently with his natural life sentence on first degree murder.

## CONCLUSION

The People of the State of Illinois respectfully request that this Honorable Court affirm defendant's convictions for first degree murder, aggravated criminal sexual assault, and robbery, and modify his sentence for aggravated criminal sexual assault to run concurrently with the natural life sentence for first degree murder.

Pursuant to People v. Nicholls, 71 Ill. 2d 166, 374 N.E.2d 194 (1978) and relevant statutory provisions 725 ILCS 5/110-7(h)(West 2004) and 55 ILCS 5/4-2002.1 (West 2004), the People of the State of Illinois respectfully request that this Court grant the People costs and incorporate as part of its judgment and mandate a fee of $100.00 for defending this appeal.  In addition, pursuant to People v. Agnew, 105 Ill. 2d 275, 473 N.E.2d 1319 (1985) and 55 ILCS 5/4-2002.1 (West 2004), the People respectfully request that this Court also grant the People an additional fee of $50.00 in the event oral argument is held in this case.

Respectfully Submitted,

RICHARD A. DEVINE,
    State's Attorney,
    County of Cook,
    Room 309 - Richard J. Daley Center,
    Chicago, Illinois 60602

Attorney for Respondent-Appellee

JAMES FITZGERALD,
ANTHONY O'BRIEN,
TAMERLA ELEBY,
Assistant State's Attorneys
    Of Counsel.

6

NOTICE
This text of this order may be changed or corrected prior to the time for filing of a Petition for Rehearing or the disposition of the same.

SIXTH DIVISION
March 2, 2007

No. 1-05-3406

TAMERLA ELEBY
P ROBERT MILAN
RIVANDA DOSS

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

07-165

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the Circuit Court of Cook County. |
| Plaintiff-Appellee, | ) | |
| v. | ) | No. 93 CR 19046 |
| RAYMOND EAVES, | ) | Honorable Paul A. Nealis, Judge Presiding. |
| Defendant-Appellant. | ) | |

### O R D E R

Defendant Raymond Eaves appeals from an order of the circuit court of Cook County granting the State's motion to dismiss his postconviction petition without an evidentiary hearing.  On appeal, defendant contends for the first time that his consecutive sentence of 30 years' imprisonment for aggravated criminal sexual assault is void because that sentence cannot be served consecutively to the natural life term imposed on his first degree murder conviction.

The record shows that defendant was sentenced to consecutive, respective terms of natural life and 30 years' imprisonment for his convictions of first degree murder and aggravated criminal sexual assault.  Defendant was also found guilty of robbery and sentenced to a concurrent term of 5 years' imprisonment.  This court affirmed that judgment on direct

Exhibit H

1-05-3406

appeal, and corrected the mittimus to reflect defendant's convictions of aggravated criminal sexual assault and robbery. People v. Eaves, No. 1-97-3959 (1999) (unpublished order pursuant to Rule 23).

On October 5, 1999, defendant filed a pro se petition for relief under the Post-Conviction Hearing Act, 725 ILCS 5/122-1 et seq (1992), alleging ineffective assistance of trial and appellate counsel. The circuit court appointed counsel to represent defendant, and on June 25, 2001, counsel filed a "Partial Supplemental Post-Conviction Petition," alleging that defendant's consecutive sentences violated Apprendi v. New Jersey, 530 U.S. 466, 147 L. Ed. 2d 435, 120 S. Ct. 2348 (2000). On October 25, 2001, the State filed a motion to dismiss defendant's petition, alleging that Apprendi did not apply retroactively to cases on collateral review, murder convictions or consecutive sentences.

On September 15, 2005, counsel filed a certificate of compliance with Supreme Court Rule 651(c), 134 Ill. 2d 651(c). On the same date, defendant filed a "Second Supplemental Petition for Post Conviction Relief," alleging that he was denied his rights to a fair trial, due process, and effective assistance of counsel. The State filed a second motion to dismiss, and on October 17, 2005, the trial court granted the State's motion and dismissed defendant's postconviction and supplemental

1-05-3406

postconviction petitions.

In this appeal from that order, defendant raises no error regarding his postconviction petitions or proceedings thereon. Rather, he contends solely, and for the first time, that his consecutive sentence is void. Defendant acknowledges his failure to raise this issue in his postconviction petition, but claims that there is no procedural bar to raising it in this court because a void sentence may be challenged at any time. We agree, and review de novo the legal issue presented. People v. Thompson, 209 Ill. 2d 19, 22-29 (2004).

Defendant's claim arises from a ruling by the supreme court in People v. Palmer, 218 Ill. 2d 148 (2006). In that case, the court determined that the purpose of the consecutive sentencing statute would not be served by imposing a sentence consecutive to a sentence of natural life based on the impossibility to serve or enforce such a sentence. Palmer, 218 Ill. 2d at 167-68. Accordingly, the court ruled that the consecutive natural-life sentences imposed on defendant in that case could not be consecutive, but only concurrent because they operate simultaneously. Palmer, 218 Ill. 2d at 168.

Following Palmer, this court vacated the consecutive sentence imposed on a defendant's conviction of robbery, and ordered that it run concurrently with the natural life sentence imposed on his conviction for first degree murder. People v.

1-05-3406

<u>Dixon</u>, 366 Ill. App. 3d 848, 856 (2006).

Based on these rulings, defendant here contends that the consecutive 30-year term of imprisonment imposed on his conviction of aggravated criminal sexual assault is void, and that this court should vacate that sentence and order it to run concurrently with his natural life sentence for first degree murder.   The State, citing <u>Palmer</u> and <u>Dixon</u>, concedes that the 30-year consecutive sentence is void, and that it should be modified to run concurrently with his natural life term.

Consistent with the reasoning expressed in <u>Palmer</u> and our prior ruling in <u>Dixon</u>, we agree that the 30-year consecutive sentence is void.   Thus, in the exercise of our authority pursuant to Supreme Court Rule 615(b)(4) (134 Ill. 2d R. 615(b)(4)), we vacate the trial court's order that defendant's 30-year sentence be served consecutively to the term of natural life, and order it to run concurrently.   <u>Dixon</u>, 366 Ill. App. 3d at 856.

For the foregoing reasons, we affirm the second-stage dismissal of defendant's postconviction petition, vacate the 30-year consecutive term of imprisonment imposed on his assault conviction and modify that sentence to run concurrently with his term of natural life imprisonment.

Affirmed in part and vacated in part; sentence modified.

JOSEPH GORDON, J., with FITZGERALD SMITH, P.J.,   and McNULTY, J., concurring.

104515

ORIGINAL

NO. _____

IN THE

SUPREME COURT OF ILLINOIS

People State of Illinois,

    Respondent

    v.

Raymond Eaves,

    Petitioner

)
)
)
)
)
)
)
)
)
)

Appellate Court,
First District
No.   1-05-3406

Circuit Court,
Cook County
No.   93 CR 19046

Hon. Paul A. Nealis,
Judge Presiding.

PETITION FOR LEAVE TO APPEAL

FILED

APR 2 4 2007

SUPREME COURT
CLERK

Raymond Eaves
Reg. No. N-28319
Menard Correctional Center
P. O. Box 711
Menard, Illinois 62259

2- 030207
∴ RH

Exhibit I

No. 1-05-3406

IN THE SUPREME COURT OF THE STATE OF ILLINOIS

---

| | |
|---|---|
| PEOPLE OF THE STATE OF ILLINOIS, | ) PETITION FOR LEAVE TO |
| | ) APPEAL FROM THE |
| Respondent | ) APPELLATE COURT OF |
| | ) ILLINOIS, |
| | ) FIRST DISTRICT |
| v. | ) No. 93 CR 19046 |
| | ) THERE HEARD ON APPEAL |
| | ) FROM THE CIRCUIT COURT |
| Raymond Eaves | ) FOR THE COOK COUNTY |
| | ) JUDICIAL CIRCUIT. |
| Petitioner | ) |
| | ) PAUL J. NEALIS PRESIDING |
| | ) JUDGE. |

---

## PETITION FOR LEAVE TO APPEAL

---

TO THE HONORABLE JUSTICE OF THE SUPREME COURT OF THE
STATE OF ILLINOIS:

May it please the Court:

I.

### PRAYER FOR LEAVE TO APPEAL

Your Petitioner, Raymond Eaves, Pro se, respectfully
petitions this Honorable Court for Leave to Appeal pursuant to
Supreme Court Rule 315, from the judgement of the Appellate
Court of Illinois, First District, which affirmed the judgement
of conviction entered by the Circuit Court of Cook County,
Illinois upon the Jury Trial finding petitioner guilty of
First Degree Murder.

## II.

On <u>October 16th 1997</u> Petitioner was found guilty of
two counts of <u>First Degree Murder</u>. Petitioner was subsequently
sentenced to a <u>Natural Life</u> prison term upon his conviction.

He appealed this conviction to the Illinois Appellate
Court, <u>First District</u>, On <u>Janurary 12th 1999</u> the Court delivered
its opinion in said appeal, affirming the judgement of conviction
and sentence. A Petition For Post Conviction Relief was then
filed <u>October 5th 1999</u>

On March 2, 2007 The Appellate Court of Illinois vacated the
trial court's order that defendant's 30-year sentence be served
consecutively to the term of natural life, and order it to run
concurrently.<u>dixon</u>, 366 Ill. App. 3d at 856.

For the foregoing reasons, we affirm the second-stage
dismissal of defendant's post convictin petition, vacate the
30-year consecutive term of imprison imposed on his assault
conviction and modify that sentence to run concurrently with
his term of natural life imprisonment.

III.


## POINTS RELIED UPON FOR REVERSAL


1. The trial court erroneously refused Mr. Eaves Involuntary
   Manslaughter Instruction.

2. The trial court denied Mr Eaves SIXTH AMENDMENT RIGHT to
   afair trial where the court denied Mr. Eaves an opportunity
   to introduce evidence that the victim in this case was a
   known prostitute and convicted felon.

3. The trial court denied Mr. Eaves right to Due Process and
   a fair trial by unconstitutional application of the Rape
   Shield Act to Mr. Eaves case.

4. The trial court denied Mr. Eaves right to effective assistance
   of appellate counsel where counsel failed to raise the issue
   of the trial judge's denial of petitioner's right to a fair
   trial and the unconstitutional application of the Rape Shield
   Act to his case.

5. The trial court erred in granting the states motion in Limine
   precluding mention that the deceased was known by Police
   as a prostitute.

6. The trial court erred in its application of Supreme Court
   Rule 431 and by its directives to counsel regarding jury
   selection process.

7. The trial court failed Mr. Eaves in letting the States
   Attorney make prejudicial, inflammatory and erroneous
   statements in closing arguments designed to arouse the

prejudices

( Con't )

the prejudices and passions of the jury, thereby prejudicing
the defendants right to a fair trial.

8. The trial court denied Mr. Eaves his Fifth Amendandment Right
by sentencing him to Natural Life for two count of First
Degree Murder. In doing this it violated the One-Act One Crime
Rule and the Proportionate Penalties Clause.

## STATEMENT AND FACTS

A grand jury indicted defendant, Raymone Eaves, on sixteen counts of first-degree murder, seven counts of aggravated criminal sexual assault, five counts of aggravated kidnapping, one count of robbery, two counts of kidnapping, and one count of unlawful restraint.

The trial court imposed a natural life sentence for two counts of first-degree murder, thirty-year consecutive term for aggravated criminal sexual assault, and a five-year term for robbery.

On the 4th of August, 1997 the defendant was offered 70-year plea bargain and was refused by Judge Paul Nealis. After the defendant privately spoke with counsel after pleading guilty to four counts that was being read by the judge. The trial judge refused to except any more pleads, stating that he heard the conversation between counsel and the defendant.

The trial court misused the Rape Sheild Act by letting the states motion for limine stand. Without that be granted to the state, the defense could not effectively present its case. The victim in this case was known by police and Judge Paul Nealis.

The defendants two counts of first-degee murder is a direct violation of his FIFTH AMENDMENT RIGHTS and a violation of his 14th AMENDMENT RIGHTS.

## SUMMARY AND ARGUMENTS

1. The Supreme Court Rule 431 was violated in Judge Paul Nealis courtroom. The Supreme Court Rule does not mandate the court to first review any direct inquirys the counsel may proffer to a respective venireperson. The court's directive did nothing but show confusion towards the applicable law of SCR 431, and stopped an effort by counsel to direct inquire to any venireperson, in that were SCR 431 to have any real force and effect (allowing proper direct inquire by counsel subject to objections and courts ruling thereon), then directing counsel to first give the court questions in writing to ask the respective venire and ording that any later counsel inquiry first to be substantively given to the court abrogates the authority of counsel to directly inquire of the venire under SCR 431. The historical practice and procedure of voir dire was preculed herein, and wholly abrogated, i.e, first came court inquiry, then counsel inquiry. That neither counsel chose ever to direct voir dire herein has significance. Questions 1-4 was denied by the court and question 5 was modified after some 28 venirepersons had been proffered the question. None misunderstood it. Two realized not only the implication they needed to consider scientific and medical evidence, but also they would be impacted by photographs which of necessity are understatedly unpleasant. That their aversion to photograhps abridged fulfilling their duty to weigh all relevent evidence-and that their aversion could well adversely impact a well-reasoned deliberation to the verdict and it continued to be a viable consideration for choosing a fair and impartial jury. Therefore to raise this violation of SCR 431 which constitutes a clear abrogation of trial defense counsel privilege under SCR 431. Your movant reaffirms and asserts the error in the proscriptions of SCR by the court hereto for complained. Tersely, courts may not abridge the reinstitution of direct voir dire by counsel as heretofore enjoyed. The nullified direct voir dire by it, application of SCR 431 and its directives to trial counsel for procedure there under.

2. The trial court misused the Rape Shield Law. It never was presented before the jury that the victim had been arrested and convicted for other crimes other then prostitution. BY granting the states motion for limine it let the state portray the victim as a good member of society.

3. After pleading guilty to 4 counts in a plea bargain. Judge Paul Nealis denied the defendant his right to a deal. The defendant Raymond Eaves was offered 60 years plus 10 years.
   After stopping proceedings to ask his attorney a question about the multiple counts in the indictment, judge Nealis some 20 to 25 feet away said he heard what the defendant said and refused to take anymore plea from the defendant.

( con't)

3. A doctors report by DR. GEORGE SAVARESE was never considered
   in the trial only in sentencing. In the conclusion of this
   report the doctor explains that the defendants behavior at
   the time of the offense can be be understood within the
   context of the following cumulative and interactive facters:

   A dyfunctional developmental history characterized by the
   presence of factors which fostered a sense of emotional
   isolation and detachment from the family, paternal images of
   rigid, domineering authoritarianism, a birth order as a middle
   child in a very large, overcrowded, blendd step-family, and
   inconsistent and overly harsh patterns of discipline, limit
   setting, and physical abuse which evolved into a severe
   characterological and indentity disturbance diagnostically
   characterized as Borderline Personality Disorder and
   Personality Disorder, NOS, with narcissistic features.

   As such, the doctor concluded that the defendants action to
   lack premeditation and instead **appear to represent an**
   unintended and undermodulated discharge of physical force
   that accompanied the explosive expression of defendants
   underlying anger and rage. Also, the use of a psychoactive
   substance and alcohol prior to and at the time of the incident
   most likely served to exacerbate these noted effects.

4. I would like for the Supreme to challenge my conviction of
   two counts of first degee murder. Under the one-act one crime
   rule multiple convictions arising of a single physicaî act
   are prohibited. Authorites for this is presented in my
   statement and facts. Under the Fifth Amendment of the U.S.
   Constitution and the 14th Amendment of the Illinois
   Constitution the defendants 2 counts of First Degree Murder
   should be unconstitutional.

Wherefore, these are arguments I wishes the Supreme Court would
look at to review my case along with all the other issues I bring
before the court.

## II.

These are a list of aurhorites that I will provide for the court.

People V.S. Cummings 351 Ill. App. 3d at 346, 813 N.E. 2d at 1007

People V.S. Hauschild 845 N.E. 2d 74 at 87

People V.S. Moss 206 Ill. 2d 503, 506, 795 N.E. 2d 208,276 Dec855

People V.S. Christy139 Ill. 2d 172,564 N.E. 2d 770,151 Ill.Dec315

People V.S. Walden 199 Ill. 2d. at 397, 769 N.E. 2d at 928

People V.S. Gueuara 216 Ill. 2d. 533,837 N.E.2d.901,297 Ill.D.450

People V.S. Martinez348Ill.App3d521,533,810N.E.2d 199,284Ill.546

People V.S. Ford 198Ill.2d.68,761N.E.2d.735,260ill.Dec 552

People V.S. Arna 168Ill.2d.107,113,658N.E.2d.445,212Ill.Dec 963

People V.S. James 362Ill.App.3d.1202,841N.E.2d.1109,299,Ill.377

People V.S. Sharp 216 Ill. 2d at 487,839 N.E. 2d. 492

U.S. V.S. Washington 434 U.S. 497,505,54L Ed.2d.717,728,985,CT.

People V.S. Lewis 175Ill.2d.412,677 N.E.2d.830,222Ill.Dec.296

Double enhancement occurs when a single factor is used both as an element of the crime and as a aggravating factor, justifying the imposition of a harsher sentence than might otherwise have been imposed.

STATE OF ILLINOIS      )
                       )
COUNTY OF COOK         )


## AFFIDAVIT


Raymond Eaves, Defendant-Appellant, first being duly sworn onoath, deposes and says that as to the matters herein, he is the defendant-appellant in the above-entitled cause, that he has read the foregoing document, by him signed, and that the statements contained herein are true in substance and in fact.


Raymond Eaves-N28719


Subscribed and sworn to before me this 21 day of March, 2007

NOTICE

The text of this order may be changed or corrected prior to the time for filing of a Petition for Rehearing or the disposition of the same.

SIXTH DIVISION
March 2, 2007

No. 1-05-3406

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the Circuit Court of Cook County. |
| Plaintiff-Appellee, | ) | |
| v. | ) | No. 93 CR 19046 |
| RAYMOND EAVES, | ) | Honorable Paul A. Nealis, Judge Presiding. |
| Defendant-Appellant. | ) | |

## O R D E R

Defendant Raymond Eaves appeals from an order of the circuit court of Cook County granting the State's motion to dismiss his postconviction petition without an evidentiary hearing. On appeal, defendant contends for the first time that his consecutive sentence of 30 years' imprisonment for aggravated criminal sexual assault is void because that sentence cannot be served consecutively to the natural life term imposed on his first degree murder conviction.

The record shows that defendant was sentenced to consecutive, respective terms of natural life and 30 years' imprisonment for his convictions of first degree murder and aggravated criminal sexual assault. Defendant was also found guilty of robbery and sentenced to a concurrent term of 5 years' imprisonment. This court affirmed that judgment on direct

1-05-3406

appeal, and corrected the mittimus to reflect defendant's convictions of aggravated criminal sexual assault and robbery. People v. Eaves, No. 1-97-3959 (1999) (unpublished order pursuant to Rule 23).

On October 5, 1999, defendant filed a pro se petition for relief under the Post-Conviction Hearing Act, 725 ILCS 5/122-1 et seq (1992), alleging ineffective assistance of trial and appellate counsel. The circuit court appointed counsel to represent defendant, and on June 25, 2001, counsel filed a "Partial Supplemental Post-Conviction Petition," alleging that defendant's consecutive sentences violated Apprendi v. New Jersey, 530 U.S. 466, 147 L. Ed. 2d 435, 120 S. Ct. 2348 (2000). On October 25, 2001, the State filed a motion to dismiss defendant's petition, alleging that Apprendi did not apply retroactively to cases on collateral review, murder convictions or consecutive sentences.

On September 15, 2005, counsel filed a certificate of compliance with Supreme Court Rule 651(c), 134 Ill. 2d 651(c). On the same date, defendant filed a "Second Supplemental Petition for Post Conviction Relief," alleging that he was denied his rights to a fair trial, due process, and effective assistance of counsel. The State filed a second motion to dismiss, and on October 17, 2005, the trial court granted the State's motion and dismissed defendant's postconviction and supplemental

- 2 -

1-05-3406

<u>Dixon</u>, 366 Ill. App. 3d 848, 856 (2006).

Based on these rulings, defendant here contends that the consecutive 30-year term of imprisonment imposed on his conviction of aggravated criminal sexual assault is void, and that this court should vacate that sentence and order it to run concurrently with his natural life sentence for first degree murder. The State, citing <u>Palmer</u> and <u>Dixon</u>, concedes that the 30-year consecutive sentence is void, and that it should be modified to run concurrently with his natural life term.

Consistent with the reasoning expressed in <u>Palmer</u> and our prior ruling in <u>Dixon</u>, we agree that the 30-year consecutive sentence is void. Thus, in the exercise of our authority pursuant to Supreme Court Rule 615(b)(4) (134 Ill. 2d R. 615(b)(4)), we vacate the trial court's order that defendant's 30-year sentence be served consecutively to the term of natural life, and order it to run concurrently. <u>Dixon</u>, 366 Ill. App. 3d at 856.

For the foregoing reasons, we affirm the second-stage dismissal of defendant's postconviction petition, vacate the 30-year consecutive term of imprisonment imposed on his assault conviction and modify that sentence to run concurrently with his term of natural life imprisonment.

Affirmed in part and vacated in part; sentence modified.

JOSEPH GORDON, J., with FITZGERALD SMITH, P.J., and McNULTY, J., concurring.

- 4 -

No. 97-3959

IN THE SUPREME COURT OF THE STATE OF ILLINOIS

| | |
|---|---|
| PEOPLE OF THE STATE OF ILLINOIS,<br>Plaintiff-Appellate, | ) APPEAL FROM THE CIRCUIT<br>) COURT OF ILLINOIS.<br>)<br>) |
| vs. | ) NO. 93CR19046<br>) |
| Raymond Eaves<br>Defendant-Appellate. | ) HONORABLE:<br>) PAUL J. NEALIS, PRESIDING |

PROOF OF SERVICE

STATE ATTORNEY

Richard A. Devine
County Of Cook, Room 309
Richard J. Daley Center
Chicago, Illinois, 60602

## DECLARATION UNDER PENALTY OF PERJURY

Pursuant to 28 USC 1746, 18 USC 1621 or 735 ILCS 5/1-109, I declare, under penalty of perjury, that I am a named party in the above action, that I have read the above documents, and that the information contained therein is true and correct to the best of my knowledge.

DATE: 3-21-07

/s/ Raymond Eaves
NAME: RAYMOND EAVES
IDOC#: N-28319
MENARd Correctional Center
P.O. BOX 711
MENARd , IL 62259

STATE OF ILLINOIS
SUPREME COURT

At a Term of the Supreme Court, begun and held in Springfield, on Wednesday,
the twenty-sixth day of September, 2007.

Present: Robert R. Thomas, Chief Justice
Justice Charles E. Freeman          Justice Thomas R. Fitzgerald
Justice Thomas L. Kilbride          Justice Rita B. Garman
Justice Lloyd A. Karmeier           Justice Anne M. Burke

---

On the twenty-sixth day of September, 2007, the Supreme Court entered the
following judgment:

No. 104515

People State of Illinois,

      Respondent

      v.

Raymond Eaves,

      Petitioner

Petition for Leave
to Appeal from
Appellate Court
First District
1-05-3406
93CR19046

The Court having considered the Petition for leave to appeal and being fully
advised of the premises, the Petition for leave to appeal is DENIED.

As Clerk of the Supreme Court of the State of Illinois and keeper of the
records, files and Seal thereof, I certify that the foregoing is a true
copy of the final order entered in this case.

IN WITNESS WHEREOF, I have hereunto
subscribed my name and affixed the Seal
of said Court, this first day
of November, 2007.

*Juleann Hornyak*

                     Clerk,
Supreme Court of the State of Illinois

Westlaw.

875 N.E.2d 1116 (Table)
225 Ill.2d 648, 875 N.E.2d 1116 (Table), 314 Ill.Dec. 829
**(Cite as: 225 Ill.2d 648, 875 N.E.2d 1116 (Table))**


People v. Eaves
Ill. 2007.
(The decision of the Court is referenced in the
North Eastern Reporter in a table captioned
"Supreme Court of Illinois Dispositions of Petitions
for Leave to Appeal".)

Supreme Court of Illinois
People
v.
**Raymond Eaves**
**NO. 104515**


SEPTEMBER TERM, 2007
September 26, 2007

Lower Court: No. 1-05-3406

Disposition: Denied.

Ill. 2007.
People v. Eaves
225 Ill.2d 648, 875 N.E.2d 1116 (Table), 314
Ill.Dec. 829

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Exhibit J